[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 02-16486

_____

**FILED**

**U.S. COURT OF APPEALS**
**ELEVENTH CIRCUIT**
February 25, 2004
**THOMAS  K. KAHN**
**CLERK**

D. C. Docket No. 97-00095 CV-DF-3

CAROL STAVROPOULOS,

Plaintiff-Appellant,

versus

EVAN FIRESTONE,
W. ROBERT NIX, et al.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

**(February 25, 2004)**

Before EDMONDSON, Chief Judge, DUBINA and COX, Circuit Judges.

COX, Circuit Judge:

## I. INTRODUCTION

Plaintiff, Carol Stavropoulos, appeals the district court's entry of summary judgment for the Defendant Board of Regents of the University System of Georgia ("Board") on her claim that the Board violated the anti-retaliation provision of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a). She also appeals the summary judgment for Defendants Evan Firestone and William Squires on her 42 U.S.C. § 1983 First Amendment retaliation claim. We affirm.

## II. BACKGROUND & PROCEDURAL HISTORY

In 1993 the University of Georgia hired Stavropoulos as an assistant professor in the School of Art for the Art Education Program. In 1993 and 1994 she received excellent job performance ratings.

As an untenured assistant professor, Stavropoulos was employed pursuant to a one-year contract. The senior faculty of the School of Art votes each year on whether to renew the contracts of its untenured assistant professors. This vote, however, is not necessarily binding. The dean and assistant dean of the School of Art have the power to override the faculty vote. And, an assistant professor has the right to appeal a vote of non-renewal by filing a grievance with the University's faculty senate, which also can override the non-renewal vote.

During the fall semester of 1994, Defendant Firestone, Director of the School of Art, selected Stavropoulos and five other professors to screen applicants and to recommend a candidate to fill a computer artist position. After reviewing the applications for the job, Plaintiff and another committee member, Dr. Bradley Tindall, believed that a female candidate, Dr. Ann Marie LeBlanc, was the best qualified. The majority of the committee, however, favored hiring Dr. David Kaufman, who was already employed in the School of Art. Because Stavropoulos believed that the majority had begun the process intending to hire Dr. Kaufman, she felt that they were treating Dr. LeBlanc's application unfairly. She voiced her concerns about this perceived unfairness, and, on one occasion, did so by yelling and shaking her fist at her fellow committee members. The committee ultimately voted, four-two, to recommend Dr. Kaufman for the job, with Stavropoulos and Dr. Tindall casting the dissenting votes.

In March 1995 the committee presented its recommendation to the faculty of the School of Art. Dr. Tindall presented his and Stavropoulos's view that Dr. LeBlanc was the most qualified candidate. The faculty voted to hire Dr. Kaufman. Afterwards, Dr. Tindall and Stavropoulos told Director Firestone that they were going to file a minority report with the Dean of the School of Art. The report, which they filed immediately, detailed Dr. LeBlanc's qualifications, and asserted that as most of

the faculty members in the computer field were men, hiring Dr. LeBlanc, a woman, would promote diversity and encourage minorities.

In response to the report, Director Firestone sent a memorandum to Stavropoulos and Dr. Tindall. In the memo, Director Firestone expressed his disapproval of the report, as the committee acted only as an advisory body. Firestone sent copies of the memo to the dean and the assistant dean of the art school.

Shortly after the faculty vote and the minority report, Dr. LeBlanc sent a letter to the University's Legal Affairs Department, stating that she may have been the victim of gender discrimination in the selection of the computer artist. Stavropoulos assisted Dr. LeBlanc by asking a faculty member in the University's Womens' Studies Department to help with Dr. LeBlanc's complaint. Director Firestone learned that Stavropoulos had provided this assistance.

Stavropoulos again received excellent performance evaluations in 1995. In June 1995, however, the faculty voted not to renew Stavropoulos's contract. Several of the faculty members who voted for non-renewal stated that they voted this way because Stavropoulos was not collegial but was insulting and hostile to her fellow faculty members. When Stavropoulos learned of the vote, she complained to the dean of the School of Art about the vote. In response to Stavropoulos's complaints, the associate dean met with Director Firestone. The associate dean asked Director

Firestone for documentation of Stavropoulos's uncollegial behavior. To provide this documentation, Director Firestone solicited and compiled letters written by faculty members discussing Stavropoulos's behavior and job performance. Firestone provided this file of letters to the dean and associate dean. After reviewing the file and the records of the faculty's non-renewal proceedings, the deans decided to reject the faculty vote as unsupported by Stavropoulos's performance ratings. Thus, Stavropoulos was given an employment contract for the 1995-96 academic year. At no time during this process had the University terminated Stavropoulos or otherwise informed her that her contract had not been renewed.

In March 1996 Stavropoulos for the first time received a negative performance evaluation. Around this time, Stavropoulos was due for a third-year review, an evaluation conducted at the end of every tenure-track teacher's third year which examines how that teacher is progressing towards being awarded tenure.[1] Director Firestone chose the four review committee members; he chose three of the four members of the review committee from outside the Art Education Program to avoid

---

[1]Around this time, Stavropoulos sought a promotion and early tenure. On the faculty's recommendation, the University denied these requests. In her complaint, and in defending against the Defendants' motions for summary judgment, Stavropoulos alleged that these denials constituted illegal retaliation. The district court concluded that while these denials were adverse employment actions, the Defendants had proffered legitimate, nondiscriminatory reasons for the denials, which Stavropoulos had failed to show to be pretextual. Stavropoulos does not challenge this conclusion on appeal.

any appearance of bias against Stavropoulos. Defendant Squires was chosen as the chairman of the committee.

When the third-year review committee convened in April 1996, Director Firestone charged them with their duties; he opened the charge with "welcome to the committee from hell." (R.3-132 at Ex. F at 199.) He also charged them to review everything regarding Stavropoulos's teaching, research, and service. Though this initially included the file of letters compiled by Firestone, the dean's office clarified that the committee could not consider those letters. The dean's office also made clear that Stavropoulos would be given the opportunity to respond to her review.

Chairman Squires gave the faculty the opportunity to be interviewed by the committee, and gave Stavropoulos the opportunity to give the committee information on her job performance. Stavropoulos alleges that Firestone encouraged faculty members to relate to the committee their negative experiences with Stavropoulos. Firestone submitted to the committee a memo recounting his version of the facts of Stavropoulos's involvement with Dr. LeBlanc's discrimination claim.

Chairman Squires prepared a memorandum entitled "Understanding the Role Played by Illness Relative to Carol Stavropoulos's Performance of Her Duties as a Faculty Member," (R.3-132 at Ex. W) in which Squires opined that Stavropoulos suffered from a mental illness which affected her ability to work with other faculty

6

members.  When the committee interviewed Stavropoulos, some members of the committee asked her about her mental health and about certain mental-health prescription drugs she may have taken.  Stavropoulos told the committee that she did not suffer from a mental illness; when she made this assertion, Chairman Squires became visibly angry.  The third-year review committee's report, published to the faculty on May 27, 1996, stated: "Although it has been mentioned to the committee as an exacerbating factor in her working relationships with others, Dr. Stavropoulos denies that illness has ever in any way compromised her performance as a faculty member."  (R.3-132 at Ex. X at 6.)

In June 1996 the faculty met to consider whether to renew Stavropoulos's employment contract for another year.  The third-year review committee presented its report.  The report discussed Stavropoulos's public anger and hostility toward other faculty members; Stavropoulos's giving "A's" to all of her students in one full calendar year, which called into question the reliability of her positive student course evaluations; Stavropoulos's resistance to learning and following procedures, both of which resulted in inaccurate guidance and advice to students; and Stavropoulos's holding classes in her home rather than on campus.  The report concluded: "The committee agreed that Dr. Stavropoulos is making good progress toward achieving promotion and tenure in the area of research.  However, persistent and ongoing

problems in the areas of teaching and service are jeopardizing Dr. Stavropoulos' progress towards promotion and tenure." (*Id.*) Chairman Squires then read a response to the third-year review report, prepared by Stavropoulos.

Later in the meeting, Squires explained to the faculty that he and Director Firestone had talked to the deans about the vote, and that the deans had said that they would not interfere with the faculty's decision this time. Squires explained that he thought that much of Stavropoulos's conduct could be attributed to a mental illness that he said she had told him privately that she suffered from. He then read a portion of his mental illness memo. At the close of the meeting, the faculty voted not to renew Stavropoulos's contract.

After Director Firestone informed Stavropoulos that the faculty had voted not to renew her contract, Stavropoulos filed a grievance with the faculty senate. The faculty senate's grievance panel held a hearing beginning on June 9, 1997. Stavropoulos was represented by an attorney in the grievance proceeding, and bore the cost of this representation. After hearing the grievance, the panel issued a report on June 23, 1997. The report concluded that the art school faculty had improperly voted not to renew Stavropoulos because of her sex, because they perceived her as having a disability, and in retaliation for her conduct in connection with the 1995 selection of the computer artist. As a result, Stavropoulos retained her job with no

loss of pay or benefits. She was not, however, reimbursed for the cost of her attorney.

Plaintiff filed this action for damages and injunctive relief, alleging violations of the First Amendment, the Equal Protection and Due Process Clauses of the Fourteenth Amendment, Title VII of the Civil Rights Act of 1964, Title IX of the Educational Amendments of 1972, and the Americans with Disabilities Act, against all Defendants.[2] Defendants Firestone and Squires moved to dismiss all claims against them, and the district court granted in part and denied in part this motion.[3] The court allowed Stavropoulos to proceed with her § 1983 First Amendment claim of retaliation brought against these Defendants in their individual capacities,[4] reasoning that, under the facts as alleged in the complaint, these Defendants were not entitled to qualified immunity. These Defendants appealed the qualified immunity ruling, and we affirmed in part, reversed in part, and remanded, concluding that Stavropoulos could proceed on her First Amendment retaliation claim to the extent that she alleged that these Defendants, in their individual capacities, retaliated against

---

[2]Stavropoulos's complaint also alleged several state law claims against Defendant W. Robert Nix. The district court dismissed these claims on Nix's motion, and Stavropoulos does not question this dismissal on appeal.

[3]Nix also joined this motion.

[4]The court also allowed Stavropoulos's official-capacity Title VII, Title IX, and ADA claims against Firestone, Squires, and Nix to proceed, though it recognized them as redundant to claims against the Board. In its summary judgment order, the district court dismissed these official-capacity statutory actions as redundant. Stavropoulos does not question this dismissal.

her for assisting Dr. LeBlanc in pursuing a claim of gender discrimination. *Stavropoulos v. Firestone*, No. 98-8723, unpublished at 2-3 (11th Cir. April 2, 1999). After discovery, all Defendants moved for summary judgment. The district court granted the motions, and entered summary judgment for the Defendants. Stavropoulos appeals.

## III. CONTENTIONS OF THE PARTIES

Stavropoulos makes two contentions on appeal. First, she argues that the district court erred in entering summary judgment for the Board on her Title VII retaliation claim. Specifically, she argues that the court erred when it concluded that neither the 1995 non-renewal vote, the 1996 negative performance review, the negative third-year review, nor the 1996 non-renewal vote constituted adverse employment actions for purposes of Title VII.

Second, Stavropoulos contends that the district court erred in granting Firestone and Squires summary judgment on her § 1983 First Amendment retaliation claim. The court held that they were shielded from suit, in their individual capacities, on the basis of qualified immunity.[5] Stavropoulos argues that the court incorrectly

---

[5]Parts of Stavropoulos's appellate briefs seem to press her § 1983 First Amendment retaliation claim against the Board. However, the district court dismissed Stavropoulos's § 1983 claims against the Board, reasoning that because the Board is an arm of the state, it is not subject to being sued under § 1983. Stavropoulos does not contend that this dismissal was in error. Thus, we examine Stavropoulos's arguments concerning her § 1983 claim as against the individual Defendants only.

held that she had failed to establish a First Amendment violation against these Defendants on the grounds that they had not subjected Stavropoulos to an adverse employment action for purposes of First Amendment retaliation.[6]

The Defendants maintain that the district court committed no error.

## IV. STANDARD OF REVIEW

We review de novo the district court's grant of summary judgment, applying the same familiar standards as the district court. *Hallum v. Provident Life & Acc. Ins. Co.*, 326 F.3d 1374, 1375-76 n.1 (11th Cir. 2003).

## V. DISCUSSION

Both of Stavropoulos's issues on appeal involve the substantiality of actions taken against her: whether these actions were substantial enough to be considered adverse employment actions under Title VII and the First Amendment.

---

[6]On appeal, Stavropuolos advances her First Amendment claims against Firestone and Squires on a retaliatory-harassment theory, *i.e.*, that the combination of their trivial acts reached such a critical mass that they created a working environment unreasonably inferior to a normal working environment. But Stavropuolos did not present this theory to the district court when summary judgment motions were pending. Instead, she presented it for the first time in a motion to reconsider the summary judgment, (R.4 -158, 159), which the district court denied as untimely (R.4-166). Stavropuolos does not argue that the court abused its discretion in denying her motion to reconsider. Because Stavropuolos failed to properly present her retaliatory-harassment theory to the district court, we decline to consider it on appeal. *Twiss v. Kury*, 25 F.3d 1551, 1556 (11th Cir. 1994) ("[W]e generally will not consider a legal theory that was not presented to the district court . . .").

11

A. Stavropoulos's Title VII Retaliation Claim against the Board

The district court granted summary judgment on Stavropoulos's Title VII retaliation claim, because it concluded that Stavropoulos failed to make out a prima facie case. To establish a prima facie case of retaliation, a plaintiff must show that (1) she engaged in protected activity, (2) she suffered an adverse employment action, and (3) there was a causal link between the protected activity and the adverse employment action. *Bass v. Bd. of County Comm'rs, Orange County, Fla.*, 256 F.3d 1095, 1117 (11th Cir. 2001). The court held that Stavropoulos failed to show an adverse employment action.

To be considered an adverse employment action for purposes of Title VII's anti-retaliation provision, the action must either be an ultimate employment decision or else must "meet some threshold level of substantiality." *Id*. at 1118 (internal quotations omitted). Ultimate employment decisions include decisions such as termination, failure to hire, or demotion. *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir. 1998). The conduct Stavropoulos complains of was not an ultimate employment action, because she did not lose her job or suffer a lessening of pay, position, or benefits. Thus, we must ask whether it rises to the level of substantiality.

In *Wideman*, 141 F.3d at 1455-56, we concluded that the plaintiff had crossed the threshold of substantiality where she established that her employer had improperly listed her as a no-show on a day she was scheduled to have off, gave her written reprimands which resulted in a one-day suspension, solicited comments on her performance from only those employees with negative things to say about her, failed to schedule her for work, threatened to shoot her in the head, and delayed authorizing medical treatment for an allergic reaction she was having. *Id*. at 1455-56 (holding that the totality of these acts meet the threshold of substantiality, but declining to decide whether anything less than the totality would meet the threshold). In *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571 (11th Cir. 2000), we characterized the threshold as requiring the employment action to be "'objectively serious and tangible enough' to alter [the employee's] 'compensation, terms, conditions, or privileges of employment . . . ,'" and held that scheduling the employee to teach on three different campuses in one term did not meet the threshold because she never actually had to follow this schedule, denying her the opportunity to teach a particular class did not suffice because she chose not to teach at all that term, and delaying the return of the employee's visa application was not serious enough because the university returned it to her in time for her to file it with the Immigration and Naturalization Service. *Id.* at 588 (quoting *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3rd Cir. 1997)).

Our reason for rejecting these three acts as insubstantial was that "[a]n action which, it turns out, had no effect on an employee is not an 'adverse' action." *Id*. at 588. Applying this standard in *Bass*, 256 F.3d at 1118, we decided there was an adverse employment action when, comparing the plaintiff to other employees of the same rank, the employer forced plaintiff to perform more menial tasks under less senior personnel; denied the plaintiff opportunities to earn several types of extra pay available to his co-workers; and forced plaintiff to take tests in order to maintain his paramedic pay, while not requiring his co-workers to take the tests. We rejected, however, the employer's ordering plaintiff not to record certain tasks in his work log and ordering him to destroy certain materials he had created as insubstantial because they "in no way punished or affected Bass' employment status." *Id*.

Here, the acts Stavropoulos complains of ultimately had no effect on her employment status. Though agents of the Board rated her negatively and voted to terminate her, other agents of the Board overrode the votes, keeping Stavropoulos in her position, with the same pay and benefits. Thus, these acts were not objectively serious and tangible enough to be adverse employment actions. *See Pennington v. City of Huntsville*, 261 F.3d 1262, 1267 (11th Cir. 2001) (noting that Title VII retaliation caselaw "indicates that the decision to reprimand or transfer an employee, if rescinded before the employee suffers a tangible harm, is not an adverse

14

employment action"). *Cf. Dobbs-Weinstein v. Vanderbilt Univ.*, 185 F.3d 542, 543-46 (6th Cir. 1999) (affirming summary judgment for university in associate professor's Title VII discrimination case because, on the professor's appeal, the faculty senate reversed the dean's decision to deny her tenure, and awarded tenure retroactively so that she lost no salary; thus there was no adverse employment action). Any emotional distress or costs incidental to Stavropoulos's seeking the review provided in her contract with the Board is likewise too insubstantial to be considered an adverse employment action since the review proved successful for Stavropoulos. *Bass*, 256 F.3d at 1118 ("While not everything that makes an employee unhappy is an actionable adverse action, conduct that alters an employee's compensation, terms, conditions, or privileges of employment does constitute an adverse action under [the anti-retaliation provisions of] Title VII.") (internal citations and quotations omitted).

Because Stavropoulos failed to show that the Board subjected her to an adverse employment action, she failed to make out a prima facie case of retaliation under Title VII.

## B. Stavropoulos's § 1983 First Amendment Retaliation Claim
against Firestone and Squires

Stavropoulos next argues that the district court erred in holding that Firestone and Squires, in their individual capacities, were protected by qualified immunity from her First Amendment retaliation claims against them.

To determine whether a state officer, acting within his discretion, is entitled to qualified immunity, we employ a two-step, sequential analysis. First, we ask whether the officer's conduct violated a constitutional right, taking the facts in the light most favorable to the party asserting the injury. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156 (2001). If we find that the officer's conduct violated a constitutional right, we must ask whether the right was clearly established. *Id.* If we find that the conduct did not violate a constitutional right, or that the right was not clearly established, then the officer is shielded from suit by qualified immunity. *Id.*

To state a claim for retaliation in violation of the First Amendment, a public employee must show that her employer retaliated against her because of her speech on a matter of public concern. *McCabe v. Sharrett*, 12 F.3d 1558, 1564 n.3 (11th Cir. 1994). A public employer retaliates when he takes an adverse employment action that is likely to chill the exercise of constitutionally protected speech. *Goffer v. Marbury*, 956 F.2d 1045, 1049 n.1 (11th Cir. 1992). Here, the district court concluded

Stavropoulos failed to establish a violation, as she failed to show that Firestone and Squires subjected her to an adverse employment action. Based on the failure to state a constitutional violation, the court held that Firestone and Squires were shielded by qualified immunity.

The district court based its conclusion that Firestone and Squires had not subjected Stavropoulos to an adverse employment action solely on its Title VII adverse-action analysis: because there was no adverse employment action for Title VII purposes, the court held without further analysis that there was no adverse action for First Amendment purposes. Stavropoulos contends that this was error, because, she argues, the First Amendment imposes a much more liberal standard in determining whether an employment action is adverse. She argues that *any* action likely to chill the employee's exercise of constitutionally protected speech satisfies the adverse employment action requirement. This standard is contrary to our precedents. While it is true that a claimant must show a chilling effect on her protected speech, she must also show that this effect resulted from an adverse employment action.

To be considered an adverse employment action in a First Amendment retaliation case, the complained-of action must involve an important condition of

employment. *Bickel v. Burkhart*, 632 F.2d 1251, 1255 n.6 (5th Cir. Unit A 1980)[7] (concluding that a fire chief's decision not to promote a firefighter in retaliation for the firefighter's negative public comments about the fire department was an adverse employment action, stating: "Where, as here, important conditions of employment are involved, a public employee will not be foreclosed from § 1983 relief merely because the impermissible retaliation did not result in the termination of his employment." ). We have defined which acts involve important conditions of employment by a list of examples. This list includes include discharges, demotions, refusals to hire or promote, and reprimands. *See Goffer*, 956 F.2d at 1049 n.1 (listing examples of adverse employment actions: "refusal to hire, demotion, reprimand, refusal to promote"). *See also McCabe*, 12 F.3d at 1563 ("'Adverse employment action' is broadly defined and as a matter of law includes not only discharges, but also demotions, refusals to hire, refusals to promote, and reprimands"; citing *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 79, 110 S. Ct. 2729, 2739 (1990),[8] where the

---

[7]Decisions of the Fifth Circuit rendered on or before September 30, 1981, are binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

[8]In *Rutan*, the Supreme Court noted with approval a Seventh Circuit case which held that "even an act of retaliation as trivial as failing to hold a birthday party for a public employee [could be actionable] when intended to punish her for exercising her free speech rights." *Rutan*, 497 U.S. at 75 n.8, 110 S. Ct. at 2737-38 n.8 (citation omitted). Because this was not the Court's holding, and was not necessary to the Court's holding, it is dicta. And since it is dicta, we decline to break with our precedents to follow it. *See Pierce v. Tex. Dept. of Crim. Justice, Inst. Div.*, 37 F.3d 1146, 1149-50 n.1 (5th Cir. 1994) (noting that this language is dicta, that the holding of *Rutan* is consistent with

Court held that a public employer could not award or deny promotions, transfers, recalls, and hires on the basis of political party affiliation without running afoul of the First Amendment).

While we have not explicitly equated this element with Title VII's adverse employment action requirement, we regularly draw cases applying this rule to inform our analysis of Title VII retaliation claims. *See, e.g., Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1238 (11th Cir. 2001) (quoting the adverse employment action passage in *McCabe*, a First Amendment retaliation case, in analyzing whether an employment action was adverse for Title VII purposes); *Wu v. Thomas*, 996 F.2d 271, 273 (11th Cir. 1993) (citing *Bickel* in its analysis of whether the plaintiffs had been subjected to an adverse employment action under Title VII). This is because the standards are consonant. *Compare Bass*, 256 F.3d at 1118 (requiring an action to be "an ultimate employment decision" or to "meet some threshold level of substantiality", and stating that "conduct that alters an employee's compensation, terms, conditions, or privileges of employment does constitute an adverse action under Title VII") *with Bickel*, 632 F.2d at 1255 n.6 (requiring "important conditions

---

*Bickel*'s requirement that to be an adverse employment action, the action must affect an important condition of employment, and therefore refusing to follow the *Rutan* dicta; but noting that in *Tao v. Freeh*, 27 F.3d 635, 639 (D.C. Cir. 1994), the D.C. Circuit applied the dicta as the rule in First Amendment retaliation cases).

19

of employment" to be involved to be an adverse employment action under the First Amendment).

Requiring the First Amendment retaliation claimant to show that the action she complains of not only was likely to chill her speech but also altered an important condition of employment insures that she satisfies the injury-in-fact requirement of federal justiciability law. To satisfy this justiciability requirement, the claimant "'must show that he has sustained, or is immediately in danger of sustaining, a direct injury as the result of that action.'" *Laird v. Tatum*, 408 U.S. 1, 13, 92 S. Ct. 2318, 2325 (1972) (quoting *Ex Parte Levitt*, 302 U.S. 633, 634, 58 S. Ct. 1, (1937)). The Supreme Court has held that, in the First Amendment context, "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of a specific present objective harm or a threat of specific future harm." *Laird*, 408 U.S. at 13-14, 92 S. Ct. at 2325-26. Thus, to satisfy principles of justiciability, an employee complaining of First Amendment retaliation must show more than her subjective belief that the employer's action was likely to chill her speech: she must show that the action had an impact on an important aspect of her employment. This too is consonant with Title VII. *See, e.g., Dennis v. County of Fairfax*, 55 F.3d 151, 156 (4th Cir. 1995) (affirming judgment as a matter of law for county on employee's Title VII and 42 U.S.C. § 1981 claims, stating: "Where an employer has taken prompt and effective

20

corrective measures to redress alleged incidents of racial harassment, the employer is not liable because its final act was not of a discriminatory nature. It is the complainant's consequent lack of injury-in-fact . . . that bars judicial redress.").

Thus, we conclude that the district court committed no error by applying Title VII standards of what is an adverse employment action to Stavropoulos's First Amendment retaliation claim. Applying this standard to Stavropoulos's claims against Firestone, and Squires, we conclude that the district court committed no error in concluding that neither of these Defendants inflicted an adverse employment action upon Stavropoulos.[9]

Stavropoulos asserts that Firestone's adverse employment actions were his sending her a memo criticizing her for filing a report with the dean's office on Dr. LeBlanc's candidacy for the computer artist position, creating the file of letters, and encouraging faculty members with negative things to say about Stavropoulos to interview with the third-year review committee. Though these are not actions appearing on the *McCabe* list of adverse employment actions, we have never held that

_____

[9]Because the district court simply relied on its analysis of whether there was an adverse employment action for purposes of Stavropoulos's Title VII claim against the Board, it did not separate Firestone and Squires's actions in determining whether either of them had taken an adverse action against her. We must do this, however, because Stavropoulos sues these Defendants individually under § 1983, and does not allege that they conspired together to retaliate against her in violation of the First Amendment. Likewise, we do not consider conduct which we considered with relation to the Board, but which cannot be attributed to Firestone or Squires.

the list cannot be expanded, so long as the action impacts an important condition of employment.[10] *Cf. Breaux v. City of Garland*, 205 F.3d 150, 157-59 (5th Cir. 2000) (noting that the Fifth Circuit has declined to expand the list beyond discharges, demotions, refusals to hire or promote, reprimands, and punitive transfers to avoid enmeshing federal courts in trivial employment matters, noting that "[s]ome benefit must be denied or some negative consequence must impinge on the Plaintiff's employment before a threat of discharge is actionable," citing *Bickel*, 632 F.2d at 1255 n.6). Taken together or separately, Firestone's acts fail to rise to the level of an adverse employment action because they had no impact on an important condition of Stavropoulos's job, such as her salary, title, position, or job duties. *Cf. Pierce v. Tex. Dept. of Crim. Justice, Inst. Div.*, 37 F.3d 1146, 1150 (5th Cir. 1994) (holding that threatening an employee to mind her own business, investigating her, videotaping her without her permission, and forcing her to take a polygraph, all in retaliation for employee's speech, were not adverse employment actions because they had no effect on the conditions of her employment, even though they may have had the effect of chilling her speech).

---

[10] *But see Rogers v. Miller*, 57 F.3d 986, 992 (11th Cir. 1995) (concluding that defendants, accused of threatening employees in retaliation for the employees' political statements, were shielded by qualified immunity from First Amendment retaliation claims, as "no caselaw existing at the time of these events clearly established that such conduct, under the circumstances, constituted 'adverse employment action' prohibited under the First Amendment").

As to Squires, Stavropoulos points to his preparing and reading to the faculty the mental illness memo as an adverse action. Like Stavropoulos's allegations regarding Firestone, this is not substantial enough to be actionable because it had no effect on an important condition of Stavropoulos's employment. *Cf. Breaux*, 205 F.3d at 158-59 (holding that, among other things, requiring an employee to undergo a psychological evaluation following the employee's intemperate remarks to a coworker was not an adverse employment action, where it had no effect on an important condition of his employment).

The district court correctly held that Stavropoulos failed to show an adverse employment action, and therefore failed to establish a constitutional violation by either Firestone or Squires. And, even if we had found that Firestone or Squires's actions amounted to a violation of Stavropoulos's First Amendment rights, our discussion of the caselaw in this area shows that there was no clearly established law to put them on notice that their actions were a violation. Thus, the district court properly held that Firestone and Squires were shielded by qualified immunity.

## VI. CONCLUSION

Because Stavropoulos failed to establish a prima facie case of retaliation under Title VII against the Board, and because Firestone and Squires are entitled to

qualified immunity from her First Amendment retaliation claims, the district court properly entered summary judgment for the Defendants.[11]

AFFIRMED.

---

[11]Stavropoulos also appeals the district court's granting Defendant Nix summary judgment on Stavropoulos's First Amendment retaliation claim. But, on appeal, she attributes to Nix none of the actions she contends were retaliatory. Thus, we affirm the district court's judgment as to Nix without further discussion.