**Bill R. EVANS, Plaintiff,**

v.

**STATE OF ALABAMA DEPARTMENT OF CORRECTIONS and Steven Watson, in his individual and official capacities, Defendants.**

Civil Action No. 2:04cv252–T.

United States District Court,
M.D. Alabama,
Northern Division.

April 11, 2005.

Albert Sims Butler, Andrew Weldon Redd, Gregory Marion Biggs, William F. Addison, Alabama Department of Corrections, Montgomery, AL, for Defendants.

## OPINION

MYRON H. THOMPSON, District Judge.

Plaintiff Bill Evans, a white male, brings this lawsuit asserting that defendants Alabama Department of Corrections ("DOC") and DOC Warden Steve Watson discriminated against him in his employment because of his race, gender, and age; created a hostile work environment; retaliated against him for making charges of racial discrimination; and abridged his rights to free speech and due process. He charges that the defendants violated the following statutes: Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. §§ 1981a, 2000e through 2000e–17 ("Title VII"); the Civil Rights Act of 1866, 42 U.S.C.A. § 1981 ("§ 1981"); the Age Discrimination in Employment Act of 1967, 29 U.S.C.A. §§ 621–634 ("ADEA"); and the First and Fourteenth Amendments to the United States Constitution as enforced through 42 U.S.C.A. § 1983 ("§ 1983").[1] The court's jurisdiction is proper under 28 U.S.C.A. § 1331 (federal question), 42 U.S.C.A. § 2000e–5(f) (Title VII), and 29 U.S.C.A. § 626(c)(1) (ADEA).

This case is now before the court on the defendants' motion for summary judgment. The motion will be granted.

## I. SUMMARY–JUDGMENT STANDARD

Summary judgment is proper where "there is no genuine issue as to any mate-

Jimmy Douglas Jacobs, Law Office of Jimmy Jacobs, Montgomery, AL, for Plaintiff.

1. As is evident, this is one of those "kitchen sink" cases, in which the plaintiff throws in all the claims he can seemingly think of, regardless as to whether a particular claim has any evidentiary basis in the record. The inclusion of clearly weak claims not only undermines the credibility of all the other claims, it requires the plaintiff, the defendant, and the court to waste their limited resources on unnecessary litigation.

rial fact" and "the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment. *Id.*

Where, as here, the non-moving party bears the burden of proof at trial, "the moving party, in order to prevail, must do one of two things: show that the non-moving party has no evidence to support ... [his] case, or present 'affirmative evidence demonstrating that the non-moving party will be unable to prove ... [his] case at trial.'" *Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir.1994) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437–38 (11th Cir.1991) (en banc)). Once the party seeking summary judgment has informed the court of the basis for the motion, the burden shifts to the non-moving party to demonstrate why summary judgment would be inappropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). To this end, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256, 106 S.Ct. at 2514. In making its determination, the court must view all evidence and any factual inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

## II. FACTUAL BACKGROUND

The State of Alabama hired Evans in 1992 as a substance-abuse counselor, and, in 1995, assigned him the task of establishing a drug-treatment program at the Alexander City Work Release Center.

On June 5, 2003, Evans was conducting a substance-abuse class with approximately 22 male students when Officers Angela Vines and Thomas Owens entered the classroom to take a routine count of the inmates. At the time, Evans was leading a program called "Focus 360," during which the class participants wrote and spoke about some event. After Vines and Owens left the classroom, Evans asked the inmates to comment on their presence. Several people later told Vines that many comments focused on her and were sexual in nature.

On June 5, 2003, Vines filed an incident report with Captain George Carter, which was later submitted to Warden Watson. In this report, Vines alleged that Evans had told the class that, were he 30 years younger, he would have been motivated to "fuck the shit out of" Vines. Vines further stated that Evans asked four to six inmates to read aloud their written thoughts on Vines and that these responses advocated rape, sodomy, and other violence towards Vines. Attached to Vines's report were several of the inmates' statements that supported her allegations.

Upon Watson's request, Evans submitted a written account of the June 5 class. Watson also took statements from at least 21 inmates who had been present in Evans's class. Most these statements confirmed that, at the every least, Evans declared to the inmates that, if he were 30 years younger, he would have sexually pursued Vines. Some of the inmates' statements indicated that Evans used more graphic language.

On June 23, 2003, upon Watson's request, Evans was transferred to the Frank Lee Youth Center in Deatsville, Alabama. Later, on July 17, 2003, an administrative hearing was held during which Evans was

represented by an attorney.[2] As a result of the testimony and evidence presented at this hearing, Evans was suspended for ten days without pay.

On September 29, 2003, Watson recommended that Lavina Burt, a white female, replace Evans at Alexander City, and Burt was subsequently hired.

After exhausting his administrative remedies with the Equal Employment Opportunities Commission ("EEOC"), Evans filed this lawsuit.

## III. DISCUSSION

### A. *Title VII & § 1981*

The shifting of proof burdens in Title VII and § 1981 cases is determined according to the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See, e.g., Walker v. Mortham*, 158 F.3d 1177, 1191 (11th Cir.1998); *Herawi v. State of Alabama Dep't of Forensic Scis.*, 311 F.Supp.2d 1335, 1344 (M.D.Ala.2004). According to this framework, a plaintiff has the initial burden of establishing a prima-facie case of unlawful employment discrimination by a preponderance of the evidence; this prima-facie case requires " 'evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion.' " *Id.* (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977)).

If the plaintiff successfully raises a presumption of illegal discrimination by establishing a prima-facie case, the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment action. Once the defendant satisfies this burden of production, the plaintiff must set forth evidence that would be sufficient to convince a reasonable fact finder that the reason given by the defendant is pretextual. *Id.*

### 1. *Race Discrimination*

*Prima–Facie Case:* One way Evans may establish a prima-facie case of illegal race discrimination is to show that: (1) he is a member of a group protected by law from discrimination; (2) he was qualified for the position; (3) he suffered an adverse-employment action; and (4) he was replaced by a person of another group or was treated less favorably than a similarly situated individual of another group. *Wilson v. Bailey*, 934 F.2d 301, 304 (11th Cir.1991); *see also McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S.Ct. at 1824. No one disputes that the first prong of the prima-facie case has been met: as a white person, Evans is protected from employment discrimination. Evans was also clearly qualified for his position: he has a record of positive performance appraisals, he has worked at the DOC for over a decade, and he had worked at the Alexander City facility for approximately six years prior to the incident underlying this case.[3] "[W]here a plaintiff has held a position for a significant period of time, qualification for that position, sufficient to satisfy the test of a prima facie case can be inferred." *Pace v. Southern Ry. System*, 701 F.2d 1383, 1386 n. 7 (11th Cir.1983). Even the defendants concede that Evans "has been a consistent and productive employee of the Alabama Department of Corrections."[4]

---

**2.** During this hearing, it was also uncovered that Evans had made a sexually suggestive comment to another female officer, Lieutenant Harrison, that involved a sexual analogy of pushing a key into a lock.

**3.** Defendants' Brief in Support of Motion for Summary Judgment (doc. no. 23) ("Defendants' Brief"), ex. 20, Employee Performance Appraisals.

**4.** Defendants' Brief, p. 5.

For the third element of his prima-facie case, Evans cites three allegedly adverse-job actions, only one of which, in fact, rises to the "threshold level of substantiality" necessary to satisfy this element. *Stavropoulos v. Firestone*, 361 F.3d 610, 617 (11th Cir.2004). In particular, Evans points to his transfer to a distant work location, the deduction of 17 points from his merit evaluation, and his ten-day suspension without pay.

■ In order to constitute an adverse-employment action, conduct must be "objectively serious and tangible enough to alter [the employee's] 'compensation, terms, conditions, or privileges of employment.'" *Id.* (quoting *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 588 (11th Cir. 2000)). Yet neither the transfer of Evans's place of employment nor the deduction of points from his evaluation is "serious and tangible enough."

■ Evans's transfer from Alexander City has required that he commute 100 miles, round trip, from his home to another facility in Deatsville, Alabama. Previously, Evans lived and worked in Alexander City; however, Evans has maintained the same salary, rank, and benefits as before. "Transfers that have required moving from one city to another have been held not be actionable where the transfer did not involve a change in salary, benefits, or any other aspect of employment. Where the changed work location does not even require one to change residences, these transfers generally merely create an inconvenience, which for purposes of Title VII is not actionable." *Baker v. Alabama Dep't of Public Safety*, 296 F.Supp.2d 1299, 1308 (M.D.Ala.2003); *see also Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 532 (10th Cir.1998) (no adverse employment action and only a "mere inconvenience" where transfer of plaintiff's employment increased commute time from between five and seven minutes to between 30 and 40 minutes); *Spring v. Sheboygan Area Sch. Dist.*, 865 F.2d 883, 886 (7th Cir.1989) (no materially adverse change in terms or conditions of plaintiff's employment where transfer of position meant that the more–than–65–year–old plaintiff would have to travel farther from home to get to work); *Burnette v. Northside Hosp.*, 342 F.Supp.2d 1128, 1136 (N.D.Ga.2004) ("[A]n overwhelming number of federal courts have held that a reassignment or transfer which results in an increased commute, without more, is not objectively serious and tangible enough to meet the threshold of substantiality.").

■ In addition, "criticisms of an employee's job performance—written or oral—that do not lead to tangible job consequences will rarely form a permissible predicate for a Title VII suit." *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1241 (11th Cir.2001). Although 17 points were deducted from Evans's performance appraisal score on his personnel evaluation for the period from April 1, 2003, to April 1, 2004, Evans cites no tangible job consequences that have resulted from this negative performance evaluation. This negative evaluation will not be considered an adverse-employment action.

Evans has, therefore, not established a prima-facie case of race discrimination with regard to his transfer and his poor performance evaluation.

■ Evans fares better with respect to his suspension. His ten-day suspension without pay was clearly an adverse-employment action. *See, e.g., Silk v. City of Chicago*, 194 F.3d 788, 805 n. 17 (7th Cir. 1999) ("The only employment action in this case that could be considered a 'tangible' one is ... [the] five-day suspension."); *Dickerson v. SecTek, Inc.*, 238 F.Supp.2d 66, 80 n. 11 (D.D.C.2002) ("courts have almost uniformly held that a disciplinary suspension for which the employee is not

compensated ... amounts to an adverse employment action.").

■ For the fourth and final element of his prima-facie case, Evans may establish that he was treated less favorably than a similarly situated individual outside of his racial group. He proposes two comparators: Officer Juanice Tensley, a black female, and Officer Smith, a black male.[5] "In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir.1997) (citation omitted).

■ In order to establish the fourth element of his prima-facie case, Evans identifies minority employees who have not been disciplined despite making racially disparaging statements and violating other departmental policies. For example, Evans accuses Officer Tensley of having openly stated that she did not like "white people," of being discourteous to white families and inmates, of using profane as well as abusive language against an inmate, and of violating departmental policy by allowing an inmate to have his "green institutional file." [6] Yet, according to Evans, no disciplinary action was taken against Tensley.

Evans also states that Officer Smith called a white officer a "redneck" on May 8, 2002. In addition, Officer Smith allegedly left handcuff keys on a key ring with the van keys; according to Evans, this breach of security might "have allowed inmates to escape while in transit and ... potentially endangered other officers and

the public." [7] Evans says that no disciplinary action was taken against Smith either.

Although it is true that Evans, as a drug-treatment counselor, held a different position from those of Smith and Tensley, the "relevant inquiry is not whether the employees hold the same job titles, but whether the employer subjected them to different employment policies. 'When an individual proves that he was fired but one outside his class was retained although both violated the same work rule, this raises an inference that the rule was discriminatorily applied.' " *Lathem v. Dep't of Children and Youth Servs.*, 172 F.3d 786, 793 (11th Cir.1999) (quoting *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1186 (11th Cir.1984)) (citation omitted). Because the defendants have offered no evidence that Evans operated under different workplace rules or policies from those of the proposed comparators, the difference in titles will not defeat the fourth element of Evans's prima-facie case.

In turning to whether Evans's conduct and punishments were similar to those of his proposed comparators, *Lathem*, 172 F.3d at 793, the court must first depict accurately Evan's conduct. As a result of his hearing, the DOC concluded that Evans had:

> "engaged in and promoted a discussion in an official classroom setting that involved sexual thoughts and feelings about an employee of Alexander Community Based Facility. When the discussion moved in the direction of a sexual nature relative to an officer of the facility, you failed to stop it, and actually encouraged and participated in the dis-

---

**5.** The first name of Officer Smith was not provided in the record.

**6.** Response to Defendants' Motion for Summary Judgment (doc. no. 36) ("Evans's

Response"), ex. 1., Evans Aff., ¶ 12. It is unclear from the record what the "green institutional file" might contain.

**7.** *Id.* at ¶ 13.

cussion. Your actions promoted an environment that creates obstacles for an officer of the Alexander Community Based Facility to overcome while carrying out her daily assigned duties."[8]

In looking at the conduct and punishment of Evans's comparators, the court concludes that neither's conduct is sufficiently similar. With respect to Officer Smith, Evans claims that a "complaint" was "filed" against him by the recipient of his "redneck" comment.[9] Yet whether this "complaint" was a formal institutional incident report (like that filed by Vines against Evans) is unclear from the record. In fact, there are no further details provided regarding this "complaint." Likewise, with respect to Officer Tensley, Evans claims that she was "charged with discourteous and disrespectful treatment of white families and inmates," yet the details of these "charges" are never discussed.[10]

■ Moreover, Smith and Tensley's misconduct is distinct from that of Evans. While Smith, Tensley and Evans may have made insensitive remarks, the similarity between their behavior and that of Evans goes no further. Evans not only made sexually disparaging remarks about an officer, the DOC also concluded that he "encouraged" such comments among inmates. While Smith may have left handcuff keys on a key ring and created a safety hazard, there is no indication that he did so intentionally. In fact, there is no indication that the key ring was left out in the open,

as opposed to in the officer's pocket. In contrast, Evans was found to have "promoted an environment" that undermined an officer's daily duties. Similarly, although Tensley may have wrongly given a file to an inmate, this act—the details surrounding which are completely absent—does not rise to the level of Evans's misconduct: "creat[ing] obstacles for an officer of the Alexander Community Based Facility to overcome while carrying out her daily assigned duties."[11]

Finally, it is unclear whether many of Evans's cited instances of alleged inappropriate behavior by Smith and Tinsley were even brought to the attention of DOC supervisors; Smith and Tinsley cannot be disciplined for behavior that was never brought to the attention of the DOC.

Evans has tried to assemble a comparator out of vague and conclusory allegations contained in his and another DOC employee's affidavits; the court does not have before it Smith's and Tinsley's personnel files or other reliable information about their employment careers.[12] In the end, Evans fails to present sufficient evidence that he "engaged in misconduct similar to that of a person outside the protected class." *Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir.1989). Indeed, it is doubtful that Evans's evidence about Tensley or Smith is reliable or even admissible; in their affidavits, Evans and his other affiant do not indicate what the source of information about Smith and Tensley is.

8. Defendants' Brief, ex. 10, DOC Letter to Evans.

9. Evans's Response, ex. 1., Evans Aff., ¶ 13.

10. *Id.* at ¶ 12.

11. Defendants' Brief, ex. 10, DOC Letter to Evans.

12. Evans submits an affidavit of Kevin Sasser, a white male who has worked at the Alexan-

der City facility. Plaintiff's Response to Defendants' Motion for Summary Judgment (doc. no. 36), ex. 11, Sasser Aff. The affidavit described discrimination against Sasser as the result of allegedly bogus charges of racial discrimination against him; then the affidavit proceeds to parrot Evans's own affidavit for several paragraphs. Regardless of whether Sasser has a claim against the DOC, Evans has still failed to submit evidence that the actions taken against him were motivated by his race.

The court finds that Evans has failed to present a prima-facie case. "If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present." *Holifield*, 115 F.3d at 1562 (citation omitted).

■ *Pretext:* Alternatively, even assuming that Evans has established a prima-facie case of race discrimination, the court must still conclude as a matter of law that he has not shown that the defendants' reason for their adverse actions is pretextual. Evans was transferred from his position as a drug-treatment counselor at the Alexander City facility, given a poor job evaluation, and suspended after a female officer's complaint of Evans's sexually suggestive comment and after an investigation during which many inmates who had been present in Evans's class corroborated that he had made a lewd statement and promoted a sexually charged discussion of an officer.

This is not a case in which there is credible evidence that the employer is implicated in fabricating evidence against the plaintiff; nor is this a case in which the evidence against the plaintiff is so weak or incredible that no reasonable employer could rely on it. This is, therefore, not a case in which the trier of fact could infer from the evidence used by the employer against the plaintiff that the employer's decision was so implausible that it must be a pretext for something else. To the contrary, the evidence against Evans is not just sufficient, it is overwhelming. *Cf. Cofield v. Goldkist, Inc.*, 267 F.3d 1264, 1268 (11th Cir.2001) (plaintiff "must adduce evidence that the disparity in qualifications is 'so apparent as virtually to jump off the page and slap you in the face.' The relevant inquiry . . ., then, is not to judge which employee was more qualified, but to determine whether any disparity between [the alleged comparator's and the plaintiff's] managerial qualifications is so great that a reasonable fact-finder could infer that Goldkist did not believe [the comparator] to be better qualified.").

Although Evans attempts to show pretext by using other Alexander City employees as comparators, these cases are easily distinguishable from his case. As noted above, as far as the court can tell from what Evans has submitted (mainly in the form of his own affidavit, whose accounts may or may not be second-hand), none of the comparators on whom Evans relies had anywhere near such an overwhelming, confirmed record of wrongdoing; indeed, the court is simply unable to determine whether the quality of evidence, if any, against the so-called comparators matched in any way that against Evans.

Nevertheless, Evans submits evidence that Warden Watson was placed at the Alexander City facility with instructions to address problems with racism at the facility.[13] Although Evans suggests that this is proof of Watson's inclination to discriminate, the fact, if true, suggests quite the contrary.

Evans further contends that none of the inmates "corroborate[d] the accusation that Watson or Vines cite as so offensive and threatening to justify the DOC actions against [him]."[14] In fact, 20 out of 22 inmates who submitted statements for the incident report indicated that Evans had told the class after Vines's departure that, if he were 30 years younger, he would have sexually pursued Vines.[15] The DOC letter in which Evans is disciplined did not accuse Evans of using specific language, but merely concluded what most of the

13. Evans's Response, ex. 11., Sasser Aff., ¶ 3.

14. Evans's Response, p. 13.

15. Defendants' Brief, ex. 3, Institutional Incident Report.

inmates had reported, namely that "after the officers had departed the classroom you made the statement to the class that if you were 30 years younger you would go after the female officer yourself, as you enjoyed a challenge."[16] The evidence that Evans had "engaged in and promoted a discussion in an official classroom setting that involved sexual thoughts and feelings about an employee" of the Alexander City facility was, as stated above, overwhelming.[17]

Finally, Evans argues that the defendants' conduct was motivated by race discrimination because of the "suspect timing of Watson's accusations, recommendations for transfer and suspension, and his zealous 'investigation' after he had already submitted his recommendations."[18] In support of his argument, Evans submits a time line that details Vines's complaint and the subsequent investigation and discipline. Yet there is little in this time line that discredits the defendants' reason for their actions as pretextual. The time line merely emphasizes that Vines reported the incident regarding Evans's alleged comments on June 5, 2003, and Watson asked Evans for a statement on June 12, 2003. Over the course of the next several days, Watson obtained several statements from inmates, corroborating Vines's complaint. Approximately 20 days after the incident and after having obtained statements from Evans, Vines, and eye witnesses, Evans was transferred on June 23. It is curious that Evans claimed that Watson notified him of his suspension on June 25, 2003, prior to the administrative hearing, but Evans received official notice of his suspension in mid-July (after the ad-ministrative hearing) and was not actually suspended until September. Although Watson continued to collect statements from inmates after Evans's transfer, the time line indicates that Watson had already obtained as many as 14 inmates' statements at the time of Evans's transfer, which Watson may reasonably have considered to be enough to warrant action against Evans.

### 2. Gender Discrimination

Evans claims that Warden Watson sought to create a vacancy for the position of drug-treatment counselor at the Alexander Facility in order to fill the position with a female.[19]

As discussed above, Evans has successfully established the first two elements of his prima-facie case: that he is a member of a class (in this case, male) and was qualified for his position. With respect to this claim, Evans additionally satisfies the fourth element of his prima-facie case by establishing that he was replaced by someone outside his class, in particular a female; however, Evans fails to show that he suffered an adverse-employment action.

Since this claim refers to only Evans's replacement by a female drug-treatment counselor, the appropriate action on which to focus is that which removed Evans from his post at the Alexander City facility and resulted in the hiring of a replacement—namely, his transfer away from the Alexander City facility. Yet, as explained above, Evans's transfer, resulting in an increased commute but no change in rank or benefits, does not constitute an adverse-employment action; therefore he has failed to establish his prima-facie case.

---

16. Defendants' Brief, ex. 10, DOC Letter to Evans.

17. Id.

18. Defendants' Brief, p. 13.

19. Although not completely clear, Evans may also be asserting a gender-discrimination claim using Office Tensley as a comparator. However, as noted in the discussion of Evans's Title VII claim, Officer Tensley is not a valid comparator.

Alternatively, even if it were assumed that Evans has established a prima-facie case of gender discrimination, he has still failed to show, as the court explained with regard to his race-discrimination claim, that the reason behind the defendants' actions is a pretext for anything else.

### 3. Hostile Work Environment

Evans claims that he suffered from a hostile work environment, presumably on the basis of his race and gender, in violation of Title VII and § 1981. In order to prove a prima-facie case of hostile-work-environment harassment under Title VII, Evans must show that: (1) he is a member of a group; (2) he was subjected to unwelcome conduct; (3) the conduct was on the basis of race or gender; (4) the conduct affected a term or condition of employment; and (5) imposition of liability on the defendant is appropriate. *See, e.g., Underwood v. Northport Health Servs., Inc.,* 57 F.Supp.2d 1289, 1301 (M.D.Ala.1999). The analytical framework for § 1981 claims is the same. *Shields v. Fort James Corp.,* 305 F.3d 1280, 1282 (11th Cir.2002).

Although Evans is clearly a member of a group and was subjected to unwelcome conduct in the form of his suspension, poor job evaluation, and transfer, he has not established, as the court discussed with regard to his race-discrimination claim, that the defendants' actions were motivated by anything illegal under federal law.

### 4. Retaliation

■ Evans claims that he was unlawfully retaliated against in violation of Title VII.[20] In order to assert a retaliation claim under Title VII, Evans must first show that he engaged in a statutorily protected activity. *Weeks v. Harden Mfg. Corp.,* 291 F.3d 1307, 1311 (11th Cir.2002).

Evans's complaint vaguely refers to "charges of discrimination on the basis of race" that Evans made.[21] Then, in his response to the defendants' motion for summary judgment, Evans merely states, without elaboration, that "he has been, and continues to be, subjected to retaliation due to his complaints of discrimination."[22] He cites, as support, two exhibits: certain paragraphs in his own affidavit and a time line of events. Yet neither contains any evidence of Evans's "charges of discrimination." Although nowhere mentioned in Evans's referenced exhibits, perhaps Evans is referring to his filing of a charge of discrimination with the EEOC. But Evans did not file his charge until November of 2003, several months after he had been transferred and suspended. Or perhaps the reason that Evans does not elaborate upon these alleged "charges of discrimination" is because there are none. The court, however, is unwilling to participate in this game of "Where in the record is the statutorily protected conduct?" Evans has failed to identify the conduct that would sustain a retaliation claim under Title VII.

Finally, even assuming that Evans had established a prima-facie case, the court must still conclude as a matter of law, for the reasons given in the preceding sections, that he has not shown that the defendants' reason for their adverse actions is pretextual for retaliation.

---

**20.** Evans also asserts a retaliation claim under § 1983. Yet "since § 1983 merely provides a mechanism for enforcing individual rights 'secured' elsewhere, i.e., rights independently 'secured by the Constitution and laws' of the United States[,] 'one cannot go into court and claim a "violation of § 1983"—for § 1983 by itself does not protect anyone against anything.'" *Gonzaga Univ. v.*

*Doe,* 536 U.S. 273, 285, 122 S.Ct. 2268, 2276, 153 L.Ed.2d 309 (2002) (quoting *Chapman v. Houston Welfare Rights Org.,* 441 U.S. 600, 617, 99 S.Ct. 1905, 1908, 60 L.Ed.2d 508 (1979)).

**21.** Complaint (doc. no. 1) ¶ 27.

**22.** Evans's Response (doc. no. 36), p. 6.

## B. *ADEA*

Evans asserts that he was illegally replaced by a woman 21 years younger than he. Evans may establish a prima-facie case of age discrimination by proving that he (1) was a member of the protected age group, (2) was subjected to adverse-employment action, (3) was qualified to do the job, and (4) was replaced by or otherwise lost a position to a younger individual. *Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir.2000).

As was true with respect to Evans's Title VII gender-discrimination claim, the appropriate, allegedly adverse-employment action on which to focus is Evans's transfer of employment since this was the action which resulted in his replacement by a younger employee. However, as explained above, this transfer does not rise to the level of an adverse-employment action. Consequently, Evans fails to state a prima-facie case under the ADEA.

Moreover, even assuming that Evans had established a prima-facie case, the court must still conclude as a matter of law, as discussed with regard to Evans's race-discrimination claim, that he has not shown that the defendants' reason for their adverse actions is a pretext for anything else, including age discrimination.[23]

## C. *§ 1983*

Evans has brought claims under § 1983 against the DOC and against Warden Watson in his individual and official capacities, asserting a violation of his rights under the First and Fourteenth Amendments.

▮ In response to Evans's § 1983 claims, the DOC asserts the defense of absolute immunity pursuant to the Eleventh Amendment. "The courts have recognized two exceptions to eleventh amendment immunity. First, Congress can abrogate eleventh amendment immunity without the state's consent when it acts pursuant to the enforcement provisions of section 5 of the fourteenth amendment.... Second, a state may waive its immunity expressly through legislative enactment." *Carr v. City of Florence, Ala.*, 916 F.2d 1521, 1524–25 (11th Cir.1990). Neither exception applies in this case. "Congress has not abrogated eleventh amendment immunity in section 1983 cases," *id.* at 1525, and the State of Alabama has not waived its immunity in § 1983 cases. *Cross v. State of Ala., State Dep't of Mental Health & Mental Retardation*, 49 F.3d 1490, 1502 (11th Cir. 1995). Consequently, the DOC enjoys absolute immunity under the Eleventh Amendment from Evans's § 1983 claims. *See Alabama v. Pugh*, 438 U.S. 781, 782, 98 S.Ct. 3057, 3057, 57 L.Ed.2d 1114 (1978) (the DOC shares the State's immunity under the Eleventh Amendment).

▮ As to Warden Watson, Evans's § 1983 claims fail on the merits. First, Evans asserts that Watson violated the Equal Protection Clause.[24] He does

---

**23.** It is very unclear from Evans's complaint and the rest of the record whether Evans is asserting a hostile-work-environment claim under the ADEA. Although it remains uncertain whether hostile-environment claims are cognizable under the ADEA in this circuit, *Hipp v. Liberty Nat. Life Ins. Co.*, 252 F.3d 1208, 1245 n. 8 (11th Cir.2001), this court need not resolve that uncertainty here. For the same reasons that Evans's race-and-gender hostile-work-environment claim fails, his similar ADEA claim fails.

**24.** Evans seems to bring a retaliation claim under the Fourteenth Amendment. To the extent that this claim is brought under the Equal Protection Clause, the court notes that the Eleventh Circuit has held that "no established right exists under the equal protection clause to be free from retaliation." *Ratliff v. DeKalb County, Georgia*, 62 F.3d 338, 340 (11th Cir.1995).

not claim that the DOC regulations were discriminatory; rather, it was Watson's application of them that he claims violated the Equal Protection Clause. "It is well settled that unequal application of a facially neutral statute may violate the Equal Protection Clause. In order to prevail on an equal-protection claim based upon the application of a facially neutral statute, it must be established that: (1) the plaintiff was treated differently than similarly situated persons; and (2) the defendant unequally applied the facially neutral statute for the purpose of discriminating against the plaintiff." *Strickland v. Alderman,* 74 F.3d 260, 264 (11th Cir. 1996) (citations omitted). Furthermore, "proof of discriminatory intent or purpose is a necessary prerequisite to any Equal Protection Clause claim." *Parks v. City of Warner Robins, Ga.,* 43 F.3d 609, 616 (11th Cir.1995). Because, as already discussed, Evans cannot demonstrate that he was treated differently from similarly situated employees, his claim under the Equal Protection Clause fails.

Evans also asserts that Watson violated his First Amendment rights, presumably for disciplining him for his sexual comment regarding Officer Vines. In order to prevail on his claim that he was unlawfully retaliated against for exercising his First Amendment rights, Watson must establish that his speech "(1) is constitutionally protected, and (2) was a substantial or motivating factor in the decision to alter his teaching assignments." *Ferrara v. Mills,* 781 F.2d 1508, 1512 (11th Cir.1986). If Evans successfully makes this showing, the burden then shifts to Watson to show by a preponderance of the evidence that he would have suspended Evans even in the absence of his protected speech. *Id.*

■ In determining whether speech is constitutionally protected, the

court should determine whether a public employee was speaking on a matter of public or private concern. "[W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Connick v. Myers* 461 U.S. 138, 147, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Id.*

■ While there may be cases in which the court struggles to discern the fine line between the 'public' and 'private' spheres, Evans's case is not one of them. Indeed, the distinction between public and private would have to be eliminated for Evans's 'lustful fantasies' to be a matter of "political, social or other concern to the community." *Id.* at 146, 103 S.Ct. at 1690. The nature of Evans's feelings towards Officer Vines was clearly a matter of personal interest. Consequently, Evans's claim under the First Amendment fails.

Finally, Evans argues that his rights under the Due Process Clause were violated because, presumably, "Watson failed to provide Evans adequate notice of the charges against him while he instituted and conducted an investigation into the allegations against him, and then subjected him to punishment beyond the level of that which the DOC informs it [sic] employees may be taken against them." [25] The latter part of Evans's argument concerning an inappropriate level of punishment has been

---

**25.** Defendants' Brief, p. 4.

addressed in the discussion of Evans's scope of authority, and the former argument is simply unsubstantiated by the record. Evans's own affidavit states that "shortly after" Vines accused Evans of making a sexually inappropriate remark, "Watson, Captain Carter and I had a conference together where I explained what had happened." [26] Then, on "June 12th Watson instructed me [Evans] to give him a written statement about what had happened in the class that day when Vines came in to do the count." [27] Moreover, at his administrative hearing on July 27, 2003, Evans was represented by an attorney. In short, Evans presents nothing even remotely similar to a denial of "notice and opportunity for hearing appropriate to the nature of the case." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313, 70 S.Ct. 652, 656–57, 94 L.Ed. 865 (1950).[28]

An appropriate judgment will be entered.

### JUDGMENT

In accordance with the opinion entered on this date, it is the ORDER, JUDGMENT, and DECREE of the court as follows:

(1) Defendants State of Alabama Department of Corrections and Steven Watson's motion for summary judgment (doc. no. 22) is granted.

(2) Judgment is entered in favor of the defendants State of Alabama Department of Corrections and Watson and against the plaintiff Bill R. Evans, with the plaintiff Evans taking nothing by his complaint.

**26.** Evans's Response, ex. 1., Evans Aff., ¶ 6.

**27.** *Id.* at ¶ 7.

**28.** Watson is sued in both his individual and official capacities. Because the court rejects all of Evans's claims on the merits, the court

It is further ORDERED that costs are taxed against the plaintiff Evans, for which execution may issue.

The clerk of the court is DIRECTED to enter this document on the civil docket as a final judgment pursuant to Rule 58 of the Federal Rules of Civil Procedure.

need not reach whether Watson is an appropriate defendant in his individual and official capacities as to Evans's Title VII and ADEA claims; nor need the court reach Watson's qualified-immunity defense to liability in his individual capacity as to Evans's § 1981 and § 1983 claims.