[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 17, 2005
THOMAS K. KAHN
CLERK

_____

No. 04-11888

_____

D. C. Docket No. 00-02212-CV-JEC-1

JANICE AKINS,
DEBRA BLOUNT,
NATALIE REVELL,

Plaintiffs-Appellants,

versus

FULTON COUNTY, GEORGIA,
JOHN GATES, Individually,
VANESSA REYNOLDS, Individually,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(August 17, 2005)**

Before BLACK and WILSON, Circuit Judges, and NANGLE[*], District Judge.

WILSON, Circuit Judge:

In this case we review a decision granting a public employee qualified immunity with respect to Plaintiffs' claim of First Amendment retaliation. The district court granted qualified immunity after determining that the law regarding constructive discharge and protected speech was not clearly established. We think that it was. However, because one of the Plaintiffs did not resign, but requested and received a favorable transfer, she cannot state a claim for constructive discharge. We reverse in part and affirm in part the district court's order granting summary judgment in favor of Defendant John Gates.[1]

## I. BACKGROUND

Plaintiffs are former employees of the purchasing department of Fulton County, Georgia. Debra Blount and Natalie Revell were employed as contracting officers. Janice Akins supervised both Blount and Revell as Contracting Division Chief and Assistant Purchasing Agent for Contracting. Defendant Gates is the department's director and ultimate supervisor of all three Plaintiffs.

---

[*] Honorable John F. Nangle, United States District Judge for the Eastern District of Missouri, sitting by designation.

[1] Plaintiffs have abandoned their claims against Defendant Vanessa Reynolds and Fulton County. We therefore affirm the district court's grant of summary judgment as to these parties.

In 1998, Plaintiffs began to notice several "irregularities" in the purchasing department's process for bidding and contracting. They claim that some transactions did not follow the department's rules and regulations. Plaintiffs and some of their coworkers requested and were granted a meeting with Fulton County Commissioner Emma Darnell for the afternoon of August 27, 1998. On the morning of the meeting, Gates spoke with one of Plaintiffs' coworkers, allegedly "lectur[ing]" her on the consequences of attending the meeting with Commissioner Darnell. According to Plaintiffs, many of their coworkers decided not to attend because of Gates's "intimidation." Plaintiffs allege that, although they discussed general work environment concerns at the meeting, the "main thrust" of their conversation was a discussion of these bidding irregularities, referring specifically to six bids in their affidavits. In addition, Plaintiffs identified six other bids that they discussed with Commissioner Darnell on later occasions.

Plaintiffs concede that their work relationship with Gates had not been perfect, but they claim that things took a turn for the worse after the meeting. For example, one of Plaintiffs' coworkers revealed in his affidavit that, on the day of the meeting, Gates instructed employees not to communicate or associate with Plaintiffs. Another coworker stated that Gates intimidated employees to keep them from speaking with Plaintiffs. According to Plaintiffs, their friends within

3

the department would no longer speak with them, and others would walk in the other direction when they saw Plaintiffs. Also on August 27, 1998, Blount and Revell received written warnings from Gates for eavesdropping, which they found in their offices upon returning from the meeting.

In the weeks and months that followed, Plaintiffs claim that Gates continued to single them out unfavorably. In September of 1998, Gates "berated" Blount for taking notes in a staff meeting, and Akins was informed that she was not to attend a year-end closeout meeting that she had attended throughout her career. A week later, Gates accused Blount of sabotaging a bid.

In October, Plaintiffs attended a Board of Commissioners meeting, as it was customary for purchasing officers to do. Plaintiffs were told by Gates's assistant that Gates wanted them to leave the meeting. They were not permitted to attend subsequent Board meetings. Gates also instructed Plaintiffs to turn over files for several projects, relieving them of the bulk of their work duties. After approximately one-and-a-half months without work, Gates claimed that there had been a misunderstanding and returned to Plaintiffs some, but not all, of their duties. On October 14, 1998, Gates accused Blount and Revell of sabotaging a bid. The next day, Gates ordered Plaintiffs to display their time sheets publicly, even though other employees were permitted to keep their time sheets private.

In December, Gates asked Blount and Revell for assistance with what they said was "unethical behavior," though they did not explain what constituted this behavior. Gates also sent Akins a letter accusing her of poor management of employees.

On January 7, 1999, Gates wrote Akins a memo threatening to suspend her for insubordination. Akins claims that this resulted from a December 1, 1998 meeting at which Gates directed her to train the staff on a computer system for which she herself had not been trained. On January 12, 1999, Gates gave Akins a memo identical to the January 7 memo, except for the date.

By this time, Blount had decided to resign due to the bid irregularities and the resulting retaliation, including Gates's accusations of sabotage. Akins conducted Blount's exit interview on January 19, 1999, when Blount revealed her reasons for leaving. Akins claims that afterwards, Gates tried to coerce her into changing Blount's written comments concerning the reasons for her departure. Allegedly in response to Akins's refusal to changing Blount's comments, Gates prepared a written performance evaluation of Akins on that same day in which he lowered her rating from "exceeds expectations" to "meets expectations." Akins did not receive this evaluation, but only learned of it when she received her personnel records in August of 2000 during discovery for this litigation.

5

In addition, Plaintiffs allege that Gates again accused Revell of sabotage by forging Gates's signature on documents and discarding papers. Revell also went through several office changes, including two moves in one day and a move from an office to a cubicle. Finally, Akins stated that Gates repeatedly reprimanded her for allowing Blount and Revell to report bid irregularities.

Plaintiffs bring a claim under 42 U.S.C. § 1983, arguing that these events, considered either individually or in the aggregate, constitute First Amendment retaliation by Gates. The district court granted summary judgment in favor of Gates based on qualified immunity. Plaintiffs appeal.

## II. STANDARD OF REVIEW

We review grants of summary judgment based on qualified immunity *de novo*. *Durruthy v. Pastor*, 351 F.3d 1080, 1084 (11th Cir. 2003). A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden

6

of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). On a summary judgment motion, we resolve all reasonable doubts and make all justifiable inferences in the non-movants' favor. *See Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000). Thus, we consider the facts in the light most favorable to Plaintiffs. *Id.*

## III. DISCUSSION

A government official acting within his discretionary authority is eligible for qualified immunity when the facts "[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a constitutional right" and when "the right was clearly established." *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156 (2001). We apply this two-step analysis below, addressing the threshold question of discretionary authority first.

## A. Discretionary Authority

To benefit from qualified immunity, a government official must make a threshold showing that his actions were undertaken pursuant to performance of his duties within the scope of his authority. *Hutton v. Strickland*, 919 F.2d 1531, 1537 (11th Cir. 1990). Plaintiffs do not dispute that Gates was acting within his discretionary authority when he issued reprimands, threatened job loss or suspension, relieved Plaintiffs of work duties and then reprimanded them for not

7

performing that work, and excluded them from meetings. We agree that these actions clearly fall within the range of Gates's discretionary authority.

## B.   Violation of a Constitutional Right

The next step in the qualified immunity inquiry is to determine whether the plaintiffs' allegations, if true, establish a constitutional violation. *Hope v. Pelzer*, 536 U.S. 730, 736, 122 S. Ct. 2508, 2513 (2002). For a public employee to establish that an employer conditioned her job in a way that burdened a constitutional right impermissibly, "the employee must first demonstrate that the asserted right is protected by the Constitution and that he or she suffered an 'adverse employment action' for exercising the right." *See McCabe v. Sharrett*, 12 F.3d 1558, 1562 (11th Cir. 1994). Once the employee makes these two showings, "the employee is entitled to prevail if the adverse employment action was taken in such a way as to infringe the constitutionally protected right." *Id.* (citations omitted).

### 1. *Constitutionally Protected Right*

The Supreme Court has recognized that the Constitution protects speech regarding governmental misconduct because it "lies near the core of the First Amendment." *Butterworth v. Smith*, 494 U.S. 624, 632, 110 S. Ct. 1376, 1381 (1990). Though not an absolute right, *see Virginia v. Black*, 538 U.S. 343, 358,

123 S. Ct. 1536, 1547 (2003), the right to free speech is a fundamental one that warrants strict scrutiny, *see Elrod v. Burns*, 427 U.S. 347, 362, 96 S. Ct. 2673, 2684 (1976).  The right implicated in this case is certainly a constitutionally protected right, entitling Plaintiffs to a determination of whether Gates has impermissibly infringed that right.  *See Bryson v. City of Waycross*, 888 F.2d 1562, 1566 (11th Cir. 1989) (noting that "a core concern of the first amendment is the protection of the 'whistle-blower' attempting to expose government corruption").

## 2.  *Adverse Employment Action*

"To be considered an adverse employment action in a First Amendment retaliation case, the complained-of action must involve an important condition of employment." *Stavropoulos v. Firestone*, 361 F.3d 610, 619 (11th Cir. 2004), *cert. denied*, __ U.S. __, 125 S. Ct. 1850 (2005).  A public employee states a case for retaliation when the alleged employment action would likely chill the exercise of constitutionally protected speech.  *See id.* at 618.  We have decided that, as a matter of law, important conditions of employment include discharges, demotions, refusals to hire or promote, and reprimands.  *Id.* (citing *Goffer v. Marbury*, 956 F.2d 1045, 1049 n.1 (11th Cir. 1992)).  In addition, any other conduct that "alters the employee's compensation, terms, conditions, or privileges of employment,

9

deprives him or her of employment opportunities, or adversely affects his or her status as an employee" qualifies as an adverse employment action. *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000) (quotation and citation omitted). Thus, if an employer's conduct negatively affects an employee's salary, title, position, or job duties, that conduct constitutes an adverse employment action. *See Stavropoulos*, 361 F.3d at 620. Constructive discharge negatively affects an employee's job status, and therefore constitutes an adverse employment action. *See Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994).[2] In other words, where working conditions are so intolerable that a reasonable person would have felt compelled to resign, the employer's conduct is an adverse employment action. *See Durley v. APAC, Inc.*, 236 F.3d 651, 658 (11th Cir. 2000) (defining constructive discharge). Similarly, a transfer to a less desirable position in terms of pay or eligibility for pay increases is an adverse employment action because it is equivalent to a demotion. *See McCabe*, 12 F.3d at 1564.

Importantly, "we have never held that the list cannot be expanded, so long

---

[2] Although *Meeks* involved a Title VII claim, we noted in *Stavropoulos* that while we have not explicitly equated the First Amendment retaliation's "important condition of employment" with Title VII's adverse employment action requirement, we regularly use First Amendment cases to inform our analysis of Title VII retaliation claims. 361 F.3d at 619–20. We observed that the two standards are consonant. As this is our practice, we cite some Title VII cases to inform our analysis here.

as the action impacts an important condition of employment." *Stavropoulos*, 361 F.3d at 620. Therefore, we are not prevented from recognizing additional adverse employment actions, such as a "constructive transfer," where work conditions become so intolerable that an employee asks to be transferred to a less desirable position with a lower salary, loss of benefits, or with fewer opportunities for salary increases. We have not previously recognized the concept of "constructive transfer." If we were to recognize such a claim as actionable, a plaintiff presumably could state a claim based on that action so long as work conditions are sufficiently intolerable, and the transfer sufficiently adverse.

In deciding whether employment actions are adverse, we consider the employer's acts both individually and collectively. *Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002) ("While the other actions of which [the plaintiff] complains might not have individually risen to the level of adverse employment action . . . , when those actions are considered collectively, the total weight of them [can] constitute an adverse employment action." (internal quotation and citation omitted)).[3]

Plaintiffs allege that they suffered the following adverse employment

---

[3] *See supra* note 2.

11

actions: unwarranted reprimands, a negative work evaluation, threat of job loss through dissolution of the contracting division, threat of suspension without pay, exclusion from meetings, removal of job duties (followed by reprimands for not completing that work), and constructive discharge. Of the adverse employment actions alleged by Plaintiffs, only constructive discharge or constructive transfer can be said to have negatively affected them. Plaintiffs have not alleged that the reprimands or the threats of suspension and job loss affected the terms and conditions of their employment or their status as employees. Nor have they made any claim that the exclusion from meetings or removal of job duties adversely affected the terms and conditions of their employment. Furthermore, although a negative work evaluation can constitute an adverse employment action under some circumstances, *see Gillis v. Ga. Dep't of Corr.*, 400 F.3d 883, 888 (11th Cir. 2005), there is no evidence in the record that Akins's compensation was or would be adversely affected by the evaluation.

Even when considered in the aggregate, these actions are not adverse. *Cf. Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1455 (11th Cir. 1998). In *Wideman*, we held that improperly listing an employee as a no-show when she was not scheduled for work, written reprimands resulting in a one-day suspension, soliciting negative comments but no positive comments about the employee from

12

other employees, failing to schedule the employee for work, and delaying authorization of medical treatment, considered collectively, was an adverse employment action. *Id.* at 1455–56. As compared with the actions at issue here, the suspension and the delay in authorization for medical treatment did affect Wideman's status as an employee and her benefits, respectively. Furthermore, failing to schedule her for work or marking her as a no-show would affect her compensation and status as an employee. Finally, although soliciting negative comments from coworkers is not in itself an adverse employment action, the employer ultimately could use the comments in combination with the employee's no-show to justify discharge.

In this case, by contrast, we do not think that the actions (exclusive of constructive discharge) rise to that level of substantiality required by our caselaw. Thus, whether considered individually or collectively, these employment actions cannot be considered "adverse" because they did not harm Plaintiffs. *See Gupta*, 212 F.3d at 589. Nonetheless, we will consider these actions because they are relevant to Plaintiffs' constructive discharge claim, to which we now turn.

To prove constructive discharge, Plaintiffs must demonstrate that working conditions were so intolerable that reasonable persons in their position would have felt compelled to resign. *See Durley*, 236 F.3d at 658. Furthermore, for a

13

constructive discharge claim to present a jury issue and thereby survive summary judgment, the plaintiff must produce substantial evidence that conditions were intolerable. *See Brochu v. City of Riviera Beach*, 304 F.3d 1144, 1155 (11th Cir. 2002).

In *Poole v. Country Club of Columbus, Inc.*, we found that the plaintiff had presented enough evidence that a reasonable person in her position could have found it intolerable when she was "[s]tripped of all responsibility, given only a chair and no desk, and isolated from conversations with other workers." 129 F.3d 551, 553 (11th Cir. 1997). Therefore, we held that Poole's constructive discharge claim survived summary judgment. *Id.*

With regard to the facts before us, only Akins and Blount resigned, and therefore only these two Plaintiffs can state a claim for constructive discharge. To support their claim, Akins and Blount have produced evidence showing that their work duties were removed and that they were excluded from meetings. They have also alleged that Gates instructed their coworkers not to talk with them. To further isolate them from their colleagues, all three Plaintiffs were required to display their time sheets publicly when their colleagues were not. Most serious is the claim that Gates accused Blount of sabotaging bids by engaging in illegal behavior. Finally, Akins and Blount did in fact resign in response to this conduct.

14

Considering the facts in the light most favorable to Akins and Blount, and comparing these facts with the facts of *Poole*, we see no material distinction between them. As such, Akins and Blount have alleged an adverse employment action sufficient to sustain a claim for First Amendment retaliation.

With respect to Revell, however, because she requested and received a transfer from her employer, she cannot state a claim for constructive discharge. At most, she can claim "constructive transfer." Revell revealed in her deposition that after her transfer, she retained her pay, vacation, and sick leave, and was even reclassified to a higher pay rate. The sole difference between the positions is that Revell can use her certification as a Certified Public Professional Buyer (CPPB) only in her former position. According to Revell, qualifying for a CPPB requires taking classes and passing certain testing modules. Because she will not be using her CPPB in her new position, Revell appears to argue that the transfer limits her career opportunities.

As noted above, for employment actions to be "adverse," they must be "objectively serious and tangible enough" to alter a plaintiff's "compensation, terms, conditions, or privileges of employment, deprive . . . her of employment opportunities or adversely affect[] . . . her status as an employee." *Gupta*, 212 F.3d at 588. We have held the standard for determining whether transfers are

15

adverse is an objective one. *Doe v. Dekalb County Sch. Dist.*, 145 F.3d 1441, 1450 (11th Cir. 1998). In that case, we agreed with our sister circuits that transfers are adverse "only where the transfers were *objectively* equivalent, at least to some degree, to demotions." *Id.* (emphasis added).

From the record before us, Revell's inability to use her CPPB certification does not appear to be objectively equivalent to a demotion. Because Revell has failed to allege facts sufficient to allow a trier of fact to conclude that this employment action was adverse, she cannot succeed in establishing her entitlement to relief. To be clear, we make no judgment as to the wisdom of recognizing the concept of constructive transfer as an adverse employment action. We do not hold that such a cause of action exists, or that it is categorically unactionable. We merely hold that the facts as alleged by Revell do not entitle her to relief.

Moreover, as we explain below, Revell cannot show that this law was clearly established. Therefore, Gates is entitled to qualified immunity with respect to Revell's claim. Before turning to the question of clearly established law, however, we continue to the next step in the analysis of Plaintiffs' claim (excluding Revell) — whether they have alleged the violation of a constitutional right.

16

### 3. *Violation of Constitutional Right*

It is well established in this circuit that, for a public employee to establish a prima facie case of First Amendment retaliation, she must show:  1) that the speech can be fairly characterized as relating to a matter of public concern, 2) that her interests as a citizen outweigh the interests of the State as an employer, and 3) that the speech played a substantial or motivating role in the government's decision to take an adverse employment action.  *See Bryson*, 888 F.2d at 1565.  If the plaintiff can establish these elements, the defendant is given the opportunity to rebut the presumption of retaliation by proving that it would have made the same decision even if the speech at issue had never taken place.  *Id.* at 1566.

For speech to be protected as speech on a matter of public concern, "it must relate to a matter of political, social, or other concern to the community." *Watkins v. Bowden*, 105 F.3d 1344, 1353 (11th Cir. 1997).  If the speech at issue is personal in nature, and "cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." *Connick v. Meyers*, 461 U.S. 138, 146, 103 S. Ct. 1684, 1690 (1983).  Even if Plaintiffs discussed private concerns regarding their work environment in the meeting, that does not disqualify them

from protection. It is well understood that "[a]n employee's speech will rarely be entirely private or entirely public." *Morgan v. Ford*, 6 F.3d 750, 755 (11th Cir. 1993). We take into account the content, form, and context of the speech to glean its "main thrust." *Id.* at 754 (citations omitted). If the "main thrust" of a public employee's speech is on a matter of public concern, then the speech is protected. *Id.* at 754–55.

Commissioner Darnell indicated in her deposition that she did not recall discussing bid irregularities at the August 27 meeting, though she conceded that the subject came up in later meetings. By contrast, Plaintiffs specifically refer to six bids discussed with Commissioner Darnell in that meeting. A reasonable jury could find that Commissioner Darnell's recollection of that meeting was incomplete. Thus, considered in the light most favorable to Plaintiffs, the speech was of public concern.[4]

Furthermore, the form and context of Plaintiffs' speech bolster their argument that the speech was public in nature. Instead of discussing the bids and work environment in a private, informal meeting, Plaintiffs requested a special

---

[4] Upon reconsideration, the district court found it "striking" that Plaintiffs did not respond to Commissioner Darnell's deposition. The court surmised that Plaintiffs thereby accepted her characterization of the meeting. We disagree because this conflict is a genuine issue of fact that ought to be resolved by the factfinder, not at the summary judgment stage.

meeting with a public official, one of the members of the governing body of the county. *Compare Watkins v. Bowden*, 105 F.3d at 1353–54 (employee's "informal and private comment . . . that [she] found the speaker's comments offensive, without more, does not constitute speech affecting a matter of public concern"), *with Cooper v. Smith*, 89 F.3d 761, 765 (11th Cir. 1996) (reporting corruption in police department to state bureau of investigation involved issue of public concern), *and Martinez v. City of Opa-Locka*, 971 F.2d 708, 712 (11th Cir. 1992) (providing testimony before city commission concerning purchasing practices of city affected matter of public concern). Due to the nature of the meeting and the status of the official, a reasonable jury could conclude that the "main thrust" of the meeting was not for private gain, but rather of public concern.

Next, we consider whether Plaintiffs' speech is protected when measured against the government's interest in the efficient provision of public services. Because Plaintiffs are public employees, and the government has an interest in preventing speech that is disruptive to the efficient rendering of public services, we balance the employee's and the government's interests as instructed in *Pickering v. Board of Education* to determine whether the speech merits protection. *See* 391 U.S. 563, 568, 88 S. Ct. 1731, 1734 (1968); *see also Stough v. Gallagher*, 967 F.2d 1523, 1526–28 (11th Cir. 1992). A "core concern" of the

19

First Amendment is the protection of whistleblowers who report government wrongdoing. *Bryson*, 888 F.2d at 1566. As a result, Plaintiffs' interest in this speech is high. Conversely, Fulton County's interest in preventing this kind of speech is low. As the district court noted, preventing Plaintiffs' speech would not seem to aid the government's interest in efficiency, since the speech would bring the alleged wrongful practices to light and lead to more efficient provision of public services. Plaintiffs' speech thus qualifies for protection under the *Pickering* test.

We turn next to consider causation, deciding whether the speech played a "substantial part" in the government's decision. Plaintiffs have presented evidence that working conditions deteriorated significantly after the meeting with Commissioner Darnell. Though working conditions had been strained prior to the meeting, Defendant's most severe alleged actions — removing their work duties, isolating Plaintiffs from their coworkers, and accusing them of sabotage — occurred after the meeting. Furthermore, all three Plaintiffs resigned or transferred out of their department within ten months of the meeting. This close temporal proximity between the meeting and Gates's actions suggest a causal relationship. *See Gupta*, 212 F.3d at 590. Based on this relationship, a reasonable factfinder could conclude that Gates took these actions on account of Plaintiffs' speech.

The final step in the First Amendment retaliation analysis allows the employer to avoid liability if it can prove that it would have taken the same actions in the absence of the protected speech. Because Gates has not presented any arguments or evidence that he would have acted in the same manner absent Plaintiffs' meeting with Commissioner Darnell, he cannot avoid liability on this basis.

## C. Clearly Established Law

The final step in the qualified immunity inquiry is determining whether the law was clearly established so as to put Gates on notice that his behavior was a violation. A right is clearly established if, in light of already-existing law, the unlawfulness of the conduct is "apparent." *See Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039 (1987). Thus, "[i]f reasonable public officials could differ on the lawfulness of a defendant's actions, the defendant is entitled to qualified immunity." *Storck v. City of Coral Springs*, 354 F.3d 1307, 1314 (11th Cir. 2003). To demonstrate that the law is clearly established, a party is not required to cite cases with materially similar facts. *Hope*, 536 U.S. at 741, 122 S. Ct. at 2516. Rather, the state of the law at the time of the unconstitutional act must be established sufficiently to give "fair warning" to the official that his conduct is unlawful. *Id.* Therefore, a constitutional provision can give fair warning when its

21

words are specific enough that they "establish clearly the law applicable to particular conduct and circumstances and to overcome qualified immunity, even in the total absence of case law." *Vinyard v. Wilson*, 311 F.3d 1340, 1350 (11th Cir. 2002).

### 1. *Fair Warning That Employment Action Was Adverse*

Plaintiffs argue that *Poole v. Country Club of Columbus, Inc.* provides fair warning that Gates's actions constituted constructive discharge. *See* 129 F.3d 551. The district court held, to the contrary, that *Poole* cannot serve as fair warning because it merely held that a reasonable jury could find that the plaintiff had suffered constructive discharge, not that those acts actually constituted a constructive discharge.

In categorically holding that *Poole* cannot serve as fair warning of the unlawfulness of a defendant's conduct, the district court erred. The practical effect of our holding in *Poole* is that the facts of the case constitute constructive discharge as a matter of law. Of course, based on the posture of the case, these facts were viewed in the light most favorable to the plaintiff. This does not alter the effect of the holding: that the facts of *Poole*, if believed, constitute constructive discharge. A holding by this Court that a particular set of facts raises a question of material fact sufficient to preclude summary judgment serves as fair

22

warning to officials. *See, e.g., Vinyard*, 311 F.3d at 1348 (citing as support *Lee v. Ferraro*, 284 F.3d 1188 (11th Cir. 2002), which reviewed a district court's disposition of a summary judgment motion).

Because Gates's conduct occurred after we issued the opinion in *Poole*, and because the facts in that case are so similar to the ones we consider here with respect to Akins and Blount, Gates was on notice that his acts would constitute constructive discharge.

With respect to Revell, however, her claim must fail because neither this Circuit nor the Supreme Court has yet to recognize the claim of "constructive transfer" as an adverse employment action. Therefore, Gates was not put on notice that his actions would violate clearly established law. Thus, Gates is entitled to qualified immunity with respect to Revell's claim of First Amendment retaliation.

## 2. *Fair Warning That Plaintiffs' Speech Was Protected*

In arguing that Gates was on notice that Plaintiffs' speech was protected, Plaintiffs rely on *Walker v. Schwalbe*, 112 F.3d 1127 (11th Cir. 1997). Gates, on the other hand, cites *Martin v. Baugh*, 141 F.3d 1417 (11th Cir. 1998), for the proposition that the law was not clearly established. Because these cases are factually similar, and because their legal import has been changed by the Supreme

Court's decision in *Hope v. Pelzer*, 536 U.S. 730, 122 S. Ct. 2508, they merit discussion in greater detail.

In *Walker*, a 1997 decision, the plaintiff, an employee of the state-sponsored Vista Community Programs, approached his superiors to complain that some budget practices violated regulations and prevented him from effectively managing the budgets for which he was responsible. In response, his superiors began to withhold budget information from Vista employees. When Walker's efforts to discuss these issues with his direct superiors failed, he sought help from state legislators. During a meeting with several state representatives and senators, Walker discussed possible improprieties in Vista's budget practices, which led to an investigation of Vista.

After the release of the investigative report, Walker suffered adverse employment actions, purportedly because he had hired his wife in violation of the state's employment policy. We concluded that the plaintiff was a whistleblower demoted in retaliation for his speech, and stated that a reasonable governmental official would have known in 1991 that he could not punish an employee for such First Amendment-protected speech, and thus, the defendants were not entitled to qualified immunity. *Walker*, 112 F.3d at 1132.

In *Martin v. Baugh*, decided in April of 1998, the City of Birmingham

24

solicited bids for an upgrade of its communications system. Two companies placed bids using two different industry standards. After rejecting both bids, the City entered into private negotiations with one of the companies, which resulted in a contract. Concerned that the system offered by that company was inferior to that offered by the other company, the plaintiff Martin, a city employee, spoke with a City Councilman and the Fraternal Order of Police and disseminated technical information to them comparing the two systems. In addition, Martin questioned the bidding standards upon which the prevailing company had submitted its bid.

Martin conducted his speech activities without the knowledge of his supervisor, Baugh. When Baugh learned of Martin's activities, Baugh accused Martin of insubordination and suggested that he resign. In addition, Baugh gave Martin written reprimands and assigned some of his duties to another employee.

In deciding the case, we observed that Martin's allegations did not establish a constitutional violation. We based our primary holding on the "clearly established" prong of the qualified immunity test. We noted that "Martin points to no case, and we find none after our own search, that would have made it obvious to a person in Baugh's position that Martin's speech . . . was constitutionally protected." *Martin*, 141 F.3d at 1421.

Importantly, we decided *Martin* before the Supreme Court released its

decision in *Hope v. Pelzer*. In that case, the Court held that the facts of previous cases need not be "materially similar" to the facts at hand to furnish fair warning of a violation. 536 U.S. at 741, 122 S. Ct. at 2516. The Court explained that "general statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful." *Id.* at 741, 122 S. Ct. at 2516 (quotation and citation omitted, alteration in original).

Thus, the Court reversed our "rigid gloss" on the qualified immunity standard and gave guidance for future decisions. *Id.* at 739, 122 S. Ct. at 2515. We return to our consideration of *Martin* with this instruction in mind. In that case, we noted the following:

> Because both prongs [of the *Pickering-Connick* test] involve legal determinations that are intensely fact-specific and do not lend themselves to clear, bright-line rules, it is nearly impossible for a reasonable person to predict how a court will weigh the myriad factors that inform an application of the . . . test. . . . Consequently, a defendant in a First Amendment suit will only rarely be on notice that his actions are unlawful. Unless the plaintiff can either produce a case in which speech materially similar to his in all *Pickering-Connick* respects was held protected . . . , or show that, on the facts of the case, no reasonable person could believe that both prongs had *not* been met, he cannot defeat a defense of qualified immunity.

26

*Martin*, 141 F.3d at 1420 (citations omitted). *Martin*'s statements regarding the qualified immunity standard are not binding because the case was decided before *Hope v. Pelzer*. Post-*Hope*, as instructed by the Supreme Court, we are compelled to engage in a different analysis.[5] Furthermore, *Martin* has limited value in determining whether the law was clearly established because the case made no finding as to whether the defendant's conduct established a constitutional violation. Thus, the case that is closest in time and similar with regard to its facts does not resolve the issue of whether the law was clearly established because *Martin* declined to make a finding of constitutional violation *vel non*.

Following *Hope*'s instructions, we find that Gates was at least on notice of *Pickering* and *Connick*, which set forth the standard for protection of the speech of public employees. *See, respectively*, 391 U.S. 563, 88 S. Ct. 1731; *and* 461 U.S. 138, 103 S. Ct. 1684. Because *Martin* makes no finding with respect to whether the defendant there violated the Constitution, it could not provide notice to the defendant. And, fully consistent with our pre-*Hope* caselaw, we found in *Martin* no case that would have made it obvious to the defendant that the plaintiff's

---

[5] Our "prior precedent rule" provides an additional rationale for our holding that *Walker* is relevant for determining the state of the law at the time of Gates's actions. "Under our prior precedent rule, a panel cannot overrule a prior one's holding even though convinced it is wrong." *United States v. Steele*, 147 F.3d 1316, 1317–18 (11th Cir. 1998) (*en banc*). *Walker* was first in time, and therefore, to the extent that *Walker* and *Martin* conflict, *Walker* controls.

speech was protected. Indeed, because we referred only to decisions with materially similar facts to guide us, it is not surprising that we found no relevant decision. Again, that Court's evaluation of the case law and its relation to the qualified immunity analysis is not controlling because it predates *Hope v. Pelzer*.

Using the *Hope* standard, we find in addition that *Bryson*, 888 F.2d at 1566, and *Walker*, 112 F.3d at 1131, put Gates on notice that Plaintiffs' speech as whistleblowers was protected by the First Amendment. Consonant with our analysis above, these cases together provide fair warning to Gates that speech whose "main thrust" is to report bidding irregularities to a public official in a meeting requested for that purpose is protected by the First Amendment.

## IV. CONCLUSION

For the foregoing reasons, we reverse the order of the district court granting summary judgment to defendant Gates with respect to Akins and Blount, and affirm as to Revell.

**AFFIRMED IN PART, REVERSED IN PART.**

No. 04-11888, *Akins v. Fulton County*

BLACK, Circuit Judge, concurring:

I concur in the result reached by the majority. I would like to emphasize that there is a disputed question of fact as to whether the "main thrust" of the

28

August 27, 1998 meeting was to discuss bidding irregularities, as Plaintiffs allege, or general work environment concerns, as Commissioner Darnell claims. This issue is best resolved by a jury, and not on a motion for summary judgment.