[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-12401
Non-argument Calendar
_____

D.C. Docket No. 1:13-cv-24048-PCH

HUMBERTO VALDES,

Plaintiff–Appellant,

versus

CITY OF DORAL,

Defendant–Appellee,

YVONNE SOLER-MCKINLEY,
RICARDO GOMEZ,

Defendants.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(October 31, 2016)

Before MARTIN, JULIE CARNES, and ANDERSON, Circuit Judges.

PER CURIAM:

Plaintiff Humberto Valdes sued the City of Doral for disability discrimination and First Amendment retaliation. The district judge entered summary judgment on both counts for the City. We conclude that Plaintiff is not a "qualified individual," as required to recover on his disability discrimination claims, and that no reasonable jury could find his speech caused the City to retaliate against him. Accordingly, we affirm.

## BACKGROUND

### I.    Facts

In 2008, Plaintiff began working as a lieutenant in the City's police department. From the beginning of his employment, Plaintiff supervised a platoon of police officers and sergeants engaged in "patrol operations." All the lieutenants in the department worked during one of three eight-hour shifts: the 6:00 a.m. to 2:00 p.m. day shift, the 2:00 p.m. to 10:00 p.m. afternoon shift, or the 10:00 p.m. to 6:00 a.m. midnight shift. Early in his employment, Plaintiff was assigned to the afternoon shift.

While on duty in March 2009, Plaintiff was involved in a car crash. After the crash, Plaintiff developed a panic disorder and began seeing a psychiatrist for treatment. From April through August 2009, the psychiatrist recommended that Plaintiff work on light duty. The City accommodated Plaintiff and he performed

2

well.  In October 2009, Plaintiff returned to full duty without restrictions.  And in November 2009, the psychiatrist determined that Plaintiff's panic disorder had reached "maximum medical improvement."

While on duty in September 2010, Plaintiff responded to a call involving a collapsed person who was in distress.  The person vomited on Plaintiff's face and eventually died.  The incident aggravated Plaintiff's symptoms that had arisen after the 2009 car crash.  Accordingly, Plaintiff returned for treatment, this time with a psychotherapist who diagnosed Plaintiff with generalized anxiety and post-traumatic stress disorder.  Plaintiff missed a week of work in October and began regular therapy sessions in November.

Plaintiff's therapy sessions conflicted with his work schedule, but the City again accommodated his needs and allowed him to modify his work hours.  Further, Plaintiff began working from his desk except in emergencies.  Emergencies that required Plaintiff to leave his desk included policing a political demonstration, leading an investigation that resulted in a multiple-felony arrest of a drug dealer, responding to a burglary in progress, and coordinating the appearance of the President of the United States.

In January 2011, the Chief of the police department added to Plaintiff's duties the lead role in a crime prevention unit that aimed to combat burglaries.

3

Plaintiff led the unit until it was disbanded in September 2011.

In March 2011, the City's HR Director received two anonymous letters alleging that the Chief and two of Plaintiff's fellow lieutenants, including Lt. Dobson, had engaged in misconduct. The City and the State of Florida began investigations into the alleged misconduct. On June 6, 2011, Plaintiff gave a statement to the City as part of its investigation. The next day, Plaintiff gave a statement to the State as part of its separate investigation. After interviewing many other employees over the next several months, the City ended its investigation and sustained the charges of misconduct against the lieutenants. Lt. Dobson was terminated and the other lieutenant was suspended for a week.

When the City terminated Lt. Dobson, he was scheduled as a platoon manager for the midnight shift. Upon Lt. Dobson's termination, the Chief notified Plaintiff that he would be rescheduled from the afternoon shift to the midnight shift to replace Lt Dobson. Plaintiff objected that his psychological disabilities prevented him from working the midnight shift. He sent a memo to the HR Director stating that (1) although he was assigned to the afternoon shift, he was working flexible, mostly daytime hours,[1] (2) a transfer to the midnight shift would aggravate his psychological conditions, and (3) the Chief's plan to transfer Plaintiff

_____

[1] Although Plaintiff was scheduled to work the afternoon shift, he regularly started work before 2:00 p.m. and left before 10:00 p.m.

was retaliation for Plaintiff's June 6 and 7 statements.  The memo concluded by asking that Plaintiff "be allowed to work the same hours."

Plaintiff met with the HR Director on November 15, 2011, to discuss the accommodation request.  During the meeting, Plaintiff explained that he suffered from anxiety, post-traumatic stress disorder, insomnia, and a panic disorder, all of which prevented him from working the midnight shift.  The HR Director requested documentation from Plaintiff's doctors.

Plaintiff remained scheduled for the afternoon shift while the HR Director considered his request.  Nonetheless, Plaintiff continued to modify his hours until November 17, 2011, when the Chief sent an e-mail reminding all the lieutenants to seek approval before adjusting their shifts.  The Chief forwarded his email to the HR Director and explained that Plaintiff was "adjusting his shift without authorization."  In response, the HR Director hypothesized that Plaintiff had done this in the past without anyone knowing about it.  She reviewed Plaintiff's "punches" and advised the Chief that Plaintiff did not adhere to his schedule most of the time.

On December 13, 2011, Plaintiff again met with the HR Director to discuss his accommodation request.  Plaintiff appeared distraught during the meeting, and he described symptoms the HR Director thought might interfere with his ability to

perform his duties even during the afternoon shift.[2]  Accordingly, the HR Director scheduled Plaintiff for a fitness for duty examination to occur on December 19 and 20, 2011.  The doctor responsible for conducting the examination verified that objective evidence supported the HR Director's concerns.

Plaintiff was relieved from duty pending the results of his fitness exam.  The Chief drove Plaintiff home on his final day before the leave.  During the drive, Plaintiff directed the Chief to an unexpected address—Plaintiff's new home.  The police department required employees to notify the City of any address change. The Chief thus initiated an internal affairs investigation into Plaintiff's change of address.  The investigation resulted in a sustained finding against Plaintiff, but no punishment was imposed.

Plaintiff subsequently underwent his fitness exam.  The doctor concluded that Plaintiff was fit for duty, but he recommended that Plaintiff remain on his current shift (which the doctor described as a "day shift") and that he continue to

---

[2]  In an affidavit, the HR Director explained:

> During my interactions with [Plaintiff] on November 15, 2011, and December 13, 2011, [Plaintiff] stated to me that he had (1) been treating for a sleep disorder, (2) took medication for that condition, and (3) experienced several panic attacks.  I also personally observed that [Plaintiff] had red eyes and appeared extremely tired during a discussion with him on December 13, 2011.  As a result, I developed concerns that [Plaintiff] may not be able to perform his duties as a City police lieutenant.

6

receive treatment.[3]  Accordingly, the City agreed to grant Plaintiff's accommodation request: as of January 9, 2012, Plaintiff returned to work still assigned to the afternoon shift rather than the midnight shift.

Following his return to work, Plaintiff began having trouble working the afternoon shift hours.  Because of the Chief's recent reminder that lieutenants must work their assigned shifts, Plaintiff e-mailed the HR Director on January 31, 2012 to request a second accommodation.[4]  Plaintiff explained that he was having trouble complying with the afternoon shift because it required him to work past 8:00 p.m., and he requested an earlier shift ending by 6:00 p.m.  After receiving Plaintiff's second accommodation request, the HR Director began investigating whether the City should grant it.

---

[3]  Specifically, the doctor stated:

> [I]f given the accommodation of day shift during the treatment period, [Plaintiff] will be able to perform his job-related duties without limitation. . . .  [I]f . . . [Plaintiff is] switch[ed] to [the] midnight shift, there is a reasonable concern that this [switch] may exacerbate his stress levels, worsen his existing sleep disorder, and may then compromise his ability to function on the job without limitation.

[4]  Permitting Plaintiff to remain on the afternoon shift constituted the City's first accommodation of Plaintiff during this time period.  Subsequently, on January 10, 2012, Plaintiff asked the HR Director if he could begin work at 1:00 p.m. instead of 2:00 p.m., visit his doctor from 2:00 p.m. to 3:00 p.m., and return to work at 3:00 p.m. for the remainder of the afternoon shift.  The HR Director instructed Plaintiff to ask the Chief.  Plaintiff complied, and the Chief agreed.  The parties have not characterized that agreement as an accommodation, although arguably it was.

7

On February 13, 2012, Plaintiff sent another e-mail to the HR Director complaining that the Chief disliked Plaintiff and intended to eventually terminate him in retaliation for his June 6 and 7 statements. A couple of days later, the HR Director met with Plaintiff to discuss his complaint and his second accommodation request. Because Plaintiff again appeared distraught and described symptoms that might interfere with his ability to do his job, the HR Director scheduled Plaintiff for a second fitness exam and placed him on administrative leave in the interim.[5] The examining doctor again verified that objective evidence supported the HR Director's concerns. After conducting the exam, the doctor concluded that Plaintiff was "temporarily unfit for duty." The doctor recommended that Plaintiff not work and instead "attend weekly professional individual counseling sessions for a minimum period of twelve weeks."

---

[5]  In her affidavit, the HR Director explained:

> [Plaintiff] reported to me that since he had returned to work on January 9, 2012, his panic attacks had increased in their frequency. [Plaintiff] also stated that he had been experiencing 3-5 panic attacks per week and that he had been required to pull his patrol vehicle over to the side of the road for approximately 45 minutes because of the [e]ffects associated with one such attack. [Plaintiff] emphasized that he was suffering from ongoing sleep difficulties which now required a change in his shift. I observed that [Plaintiff] appeared tired. I became concerned that his condition had deteriorated since I met with him on December 13, 2011, and I became concerned that the change in his condition may have rendered him unfit for duty.

8

Plaintiff remained on administrative leave for months.  During that time, Plaintiff began his own personal investigation into whether the Chief and other City officials had committed criminal misconduct.  In connection with his investigation, Plaintiff submitted various public records requests to the police department and various complaints to government officials.

Meanwhile, in accordance with the fitness examiner's recommendation, Plaintiff attended regular therapy sessions with Dr. Bernardo Garcia-Granda.  On September 11, 2012, after months of treating Plaintiff, Dr. Garcia-Granda informed the City by letter that Plaintiff could return to work "on a trial basis."  However, Dr. Garcia-Granda's letter limited Plaintiff to "office work during the day." Consistent with this limitation, Dr. Garcia-Granda testified in his deposition that Plaintiff could not work on the streets, drive a police car, testify in court, or manage a law enforcement situation requiring patrol or arrest.[6]  In short, Dr. Garcia-Granda confirmed that he had indeed "restricted [Plaintiff] to office work during the day."

The City concluded that Plaintiff could not return to work as a lieutenant because Dr. Garcia-Granda's restrictions conflicted with a lieutenant's

[6] Plaintiff argues that we must ignore these deposition comments.  We see no need to address his argument because Dr. Garcia-Granda's deposition merely confirms the restrictions already stated in the September 11 letter.

9

responsibilities.  Accordingly, on October 5, 2012, the City offered Plaintiff a police clerical aide position, the only available position that comported with Dr. Garcia-Granda's restrictions.  The City asked Plaintiff to respond to its offer by October 11 or 12, 2012.

On October 12, Plaintiff criticized the City but declared that he "need[ed] to work and w[ould] accept any other available position."  The City interpreted Plaintiff's ambiguous response as an "initial rejection" but nonetheless extended the response deadline to noon on October 15.  Plaintiff thanked the City for the extension and stated, "I will respond by Monday, October 15, 2012, at 12 noon."  However, on the morning of October 15, Plaintiff responded that he would "not . . . comply[]" with the City's extended deadline.  The City interpreted Plaintiff's response as a rejection and resignation.  The City confirmed in an e-mail to Plaintiff that (1) he had not accepted the City's offer to transfer him to a position within his restrictions and (2) the City thus considered him to have voluntarily resigned.  Thereafter, after 6:00 p.m. on the same day, Plaintiff responded with a summary of his earlier communications and concluded, "Please tell me when and where to report for my new job as a Police Clerical Aide . . . ."  The City responded that the offer's deadline had elapsed before Plaintiff responded and that the City had accepted Plaintiff's resignation as of the deadline's passage.

10

## II.    Procedural History

Plaintiff sued the City for violating the Americans with Disabilities Act (ADA), the Florida Civil Rights Act (FCRA), and the First Amendment.[7]  The ADA and FCRA counts allege that the City discriminated against Plaintiff because of his disability.  The First Amendment count alleges retaliation and seeks relief under § 1983.  The district court entered summary judgment against Plaintiff on all three counts.  As to the ADA and the FCRA claims, the court held that Plaintiff was not a "qualified individual" protected by the ADA or the FCRA because he could not perform the essential functions of his job.  As to the First Amendment retaliation claim, the court held that no reasonable jury could find that Plaintiff's protected speech motivated any adverse action against him.

## DISCUSSION

## I.    Standard of Review

We review a district court's grant of summary judgment de novo.  *Jarvela v. Crete Carrier Corp.*, 776 F.3d 822, 828 (11th Cir. 2015).  We apply the same standard as the district court, construing the facts and drawing all reasonable inferences in the light most favorable to Plaintiff.  *Id.*

---

[7]  Plaintiff asserted seven other claims, which the district court either dismissed or entered judgment on.  Plaintiff does not challenge those rulings.

11

## II.    ADA and FCRA Claims

The ADA prohibits discrimination "against a qualified individual on the basis of disability."  42 U.S.C. § 12112(a).  To establish a prima facie case of discrimination under the ADA, Plaintiff must show that "he had a disability, he was a qualified individual, and he was subjected to unlawful discrimination because of his disability."  *Mazzeo v. Color Resolutions Int'l, LLC*, 746 F.3d 1264, 1268 (11th Cir. 2014).  Plaintiff's FCRA claim includes the same essential elements.  *Frazier-White v. Gee*, 818 F.3d 1249, 1255 (11th Cir. 2016).

The determinative issue in this case is whether Plaintiff was a "qualified individual" when the City terminated him.  To be "qualified" under the ADA, an individual must be able to perform the "essential functions" of his job with or without reasonable accommodation.  42 U.S.C. § 12111(8).  It is undisputed that Plaintiff was limited to "office work" when the City terminated him.  Consistent with that restriction, Plaintiff's doctor testified that he could not drive a police car, patrol the streets, make an arrest, testify in court, manage a law enforcement situation, or do anything else that required leaving the office.

Whether a particular job function is essential is evaluated "on a case-by-case basis by examining a number of factors."  *Samson v. Fed. Exp. Corp.*, 746 F.3d 1196, 1200–01 (11th Cir. 2014) (citing *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d

12

1220, 1230 (11th Cir. 2005). The employer's judgment as to what functions of a job are essential is entitled to "substantial weight" in the analysis, as is any written job description. *Id.* at 1201. Other relevant factors include the amount of time spent performing the function, the consequences of not requiring the employee to perform the function, and the work experience of past employees in the job and current employees in similar jobs. *Id.*

The City has made clear that, in its judgment, the ability to work outside the office is essential to the lieutenant job. In fact, one reason the City terminated Lt. Dobson is that its internal investigation revealed that Dobson was leaving the jurisdiction while on duty, thus rendering him unable to respond to any situations or emergencies that required his on-site physical presence. In a memo summarizing the investigation, the City emphasized that a lieutenant, as the "highest ranking officer" on duty during his shift, must be able to provide "on-site leadership and direction to the officers and staff." Depending on the situation, that might include "immediately and physically" responding to arising emergencies in the City or providing "physical assistance or backup to any police officers" in the field.

The City's written job description likewise identifies many duties that a lieutenant must perform outside the office, including testifying in court and other

13

hearings, making arrests, investigating robberies, homicides, and other crimes, attending trainings, and delivering first aid.[8]  In addition, according to the job description, a lieutenant "[s]upervises and participates in a variety of special criminal investigative units or specialized support activities including staff training, vice, narcotics and criminal intelligence investigations, internal review functions, court service and licensing activities, [and] communications operations." Lt. Dobson testified that these activities were "done largely in the field."

The experiences of past and current lieutenants confirm that there are occasions when a lieutenant must work outside the office.  Plaintiff stated during his deposition that as a lieutenant he had:  managed two hostage incidents, patrolled, made arrests, seized property, driven a police car, spot-checked his officers, responded to emergencies, and testified in court.[9]  Indeed, Plaintiff's disabilities arose from two events—the 2009 car crash and the 2010 vomiting incident—that occurred while Plaintiff was working outside the office.  Plaintiff confirmed that even while he was on light duty in the aftermath of the vomiting

---

[8]  The written job description evolved during the course of Plaintiff's employment with the City. Like the district court, we rely only on the responsibilities common to each version of the description.

[9]  In a November 2011 memo to the HR Director, Plaintiff stated that he had "received numerous calls from supervisors and . . .  responded to various scenes when needed."

14

incident, he had:  testified in court, seized and impounded property, made arrests, executed search warrants, responded to car accidents, patrolled in his police car when required, and conducted other miscellaneous work in the field such as policing a political demonstration and coordinating the appearance of the President of the United States.  Other lieutenants also worked outside the office.  Namely, Lt. Dobson patrolled, assisted in an arrest, testified in court, responded to and assisted at major crime scenes, and provided backup to officers in the field.

As to the consequences of employing a lieutenant who cannot leave the office, we agree with the district court's analysis:

> [T]he burden on the City that would result from not requiring [Plaintiff] to perform the above-listed functions supports a finding that the functions are essential.  After Dobson was terminated in November 2011, [Plaintiff] and [one other lieutenant] were the only lieutenants assigned to oversee all three shifts commanding the City's patrol officers and sergeants.  If [Plaintiff] could not leave the office or participate in stress-inducing activities or respond to emergencies, the City would likely either have to hire another lieutenant to work at the same time as [Plaintiff] or shift an undue burden on the City's only other lieutenant [working as a platoon manager], causing further demands on the already depleted lieutenant ranks.

We recognize that there is some evidence in the record to suggest that lieutenants do not spend a significant amount of their time working outside the office.  Plaintiff testified that his duties were primarily administrative and

15

supervisory, and that he was not expected to routinely engage in road patrol or make arrests. According to Plaintiff, he voluntarily assumed a more active role in the field than was required by the City or embraced by other lieutenants, few of whom left the office on a regular basis. But that evidence does not affect our conclusion that a lieutenant must have the *ability* to leave the office. Indeed, Plaintiff acknowledged that lieutenants must provide assistance to officers in the field when necessary, and that, since his car accident in 2009, he had been called upon to provide such assistance during various emergency situations that required him to make "life and death decisions" and coordinate "complex criminal matters" from the scene.

In sum, the evidence is that a lieutenant must have the ability to work outside the office even though he might not frequently be called upon to demonstrate that ability. *See Holbrook v. City of Alpharetta, Ga.*, 112 F.3d 1522, 1528 (11th Cir. 1997) (finding that being "prepared to respond to unexpected events" was an essential function of the plaintiff's job, although the need for such a response was relatively infrequent). In that sense, a lieutenant is like a lifeguard, who must have the ability to rescue a swimmer in distress although he might not spend much time actually engaged in that essential activity. Given the substantial evidence favoring the City, there is no basis for a reasonable jury to find that

16

Plaintiff could perform the essential function of working outside the office.[10]  The

City is thus entitled to summary judgment on Plaintiff's ADA and FCRA claims.

## III.    Plaintiff's First Amendment Claim

Plaintiff's First Amendment claim is governed by a four-stage analysis.  *See*

*Carter v. City of Melbourne, Fla.*, 731 F.3d 1161, 1168 (11th Cir. 2013).  First, we

consider whether Plaintiff's speech was made as a citizen on "a matter of public

concern."  *Id.* (quoting *Rankin v. McPherson*, 483 U.S. 378, 384 (1987).  If that

threshold requirement is satisfied, we then weigh Plaintiff's First Amendment

interests against the City's interest in regulating his speech to promote "the

efficiency of the public services it performs through its employees."  *Id*. (quoting

*Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)). These first two issues

determine whether Plaintiff's speech is protected by the First Amendment.  *Battle*

*v. Bd. of Regents for Ga.*, 468 F.3d 755, 760 (11th Cir. 2006).  They are questions

of law that are resolved by the court.  *Id.*

Assuming Plaintiff's speech is protected, the third stage of the analysis

---

[10]  Plaintiff asserts that the City accommodated other employees who could not work outside the office and that it accommodated him in that regard after the 2009 car accident and 2010 vomiting incident.  However, Plaintiff fails to show that any of the other accommodated employees held a position or had restrictions similar to his own.  As to Plaintiff's own accommodations, that the City may have temporarily exceeded its legal obligations in the past does not mean it must continue to accommodate Plaintiff in the future by eliminating an essential function of his job. *See Holbrook*, 112 F.3d at 1528.

17

requires him to show that it was a substantial motivating factor in an adverse employment action taken against him. *Id.* If Plaintiff is able to make that showing, the burden shifts to the City to prove that it would have taken the same action even in the absence of his speech. *Id.* These final two issues address the causal link between Plaintiff's speech and the alleged adverse action. They are questions of fact that are resolved by the jury, unless there are no material disputes in the evidence. *Id.*

According to the district court, the following speech by Plaintiff satisfied the first two stages of the analysis: (1) his June 6, 2011 statement in connection with the City's internal investigation, (2) his June 7, 2011 statement in connection with the State's internal investigation, (3) his request in the summer of 2012 for public records related to the police department, and (4) his request around the same time that the government formally investigate the Chief and other City officials. We assume without deciding that the district court properly held that Plaintiff had engaged in protected speech because we find reason to affirm its decision regardless.

To satisfy the third element of the analysis, Plaintiff must identify at least one employment action that had a "materially adverse effect" on him. *Crawford v.*

18

*Carroll*, 529 F.3d 961, 973 (11th Cir. 2008).[11]  This standard does not protect an

individual from "trivial harms"—such as "petty slights" or "minor annoyances"—

which are not actionable.  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53,

68 (2006).  Rather, it protects an individual from retaliation that produces a

significant injury or harm.  *Id.* at 67.

Plaintiff describes nine events as adverse employment actions:  (1) the

Chief's disbanding the crime prevention unit, (2) the Chief's "increased scrutiny"

of Plaintiff, (3) the Chief's transferring Plaintiff to the midnight shift, (4) the

Chief's insistence that Plaintiff ask for permission before flouting the shift

schedule, (5) the HR Director's requiring Plaintiff to undergo the first fitness exam

and placing Plaintiff on administrative leave in the interim, (6) the Chief's

initiating the internal affairs investigation into Plaintiff's change of address, (7) the

HR Director's refusing to grant Plaintiff's January 2012 request for an earlier shift,

(8) the HR Director's requiring Plaintiff to undergo a second fitness exam and

again placing Plaintiff on administrative leave in the interim, and (9) the City's

refusing to accommodate Plaintiff's September 2012 request to work as a

---

[11] *Crawford* considers a Title VII rather than a First Amendment retaliation claim, but we have observed that "the two standards are consonant."  *Akins v. Fulton Cty., Ga.*, 420 F.3d 1293, 1301 n.2 (11th Cir. 2005).

19

lieutenant with the guarantee of never leaving the office and never working at night. As discussed below, many of these incidents are not actionable.

As to the Chief's decision to disband the crime prevention unit, the decision did not affect Plaintiff's pay or grade and, although Plaintiff's responsibilities changed after the decision, there is no evidence they changed for the worse. *See Trask v. Sec'y, Dep't of Veterans Affairs*, 822 F.3d 1179, 1194 (11th Cir. 2016) (expressing doubt about whether a reassignment was an adverse employment action where the resulting decreased responsibility and prestige were insubstantial). The Chief's increased scrutiny and demand that Plaintiff comply with his schedule constitute "trivial harms" at most. *Burlington N.*, 548 U.S. at 68. Plaintiff's transfer to the midnight schedule did not harm Plaintiff at all because the City never required Plaintiff to work during the midnight shift. Likewise, the internal affairs investigation did not harm Plaintiff because he was never disciplined for its results. Finally, the alleged refusal to grant Plaintiff's January 2012 request for an earlier shift never occurred, because Plaintiff went on administrative leave while the HR Director was investigating the request and before she could determine whether to grant it.

Remaining are: (1) the City's requirement that Plaintiff undergo fitness exams in December 2011 and February 2012, and that he remain on administrative

20

leave pending their completion and (2) the City's refusal to grant Plaintiff's September 2012 request for accommodations.  We assume for purposes of this appeal that placing Plaintiff on administrative leave pending his fitness exams constituted an adverse employment action.  *Compare Dahlia v. Rodriguez*, 735 F.3d 1060, 1078–79 (9th Cir. 2013) (holding that the plaintiff's placement on paid administrative leave constituted an adverse action for purposes of a First Amendment retaliation claim), *with Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 787 (7th Cir. 2007) ("We agree with our sister circuits, and find that the [defendant]'s placement of [the plaintiff] on paid administrative leave pending the results of his fitness-for-duty psychological examinations did not constitute a *materially* adverse action.").  In addition, the City's refusal to grant Plaintiff's September 2012 accommodations request substantially resembles a termination, which "is certainly an adverse employment action."  *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006).

Having identified three potentially adverse employment actions, we must consider whether Plaintiff's protected speech played a "substantial or motivating role" in any of those actions.  Because this inquiry is factual, we examine the record as a whole to determine whether Plaintiff has presented sufficient evidence for a reasonable jury to find for him on this issue.  *Stanley v. City of Dalton, Ga.*,

21

219 F.3d 1280, 1291 (11th Cir. 2000).  Several factors are relevant to the analysis, including (1) the time between Plaintiff's speech and the adverse action, (2) whether the City's stated reason for the action is pretextual or has varied, and (3) whether the City's other actions or words evidence a causal relation between the speech and the adverse action.  *Id.* n.20.  As discussed above, assuming Plaintiff establishes causation, the City may nonetheless prevail by showing that it would have taken the same action absent Plaintiff's speech.  *Vila v. Padrón*, 484 F.3d 1334, 1339 (11th Cir. 2007).

We hold that for each of the allegedly adverse actions, Plaintiff either failed to show causation or the City decidedly demonstrated that it would have taken the action regardless of Plaintiff's speech.  There is no direct evidence that any of the actions resulted from retaliatory animus, and as the district court explained in its thorough analysis, the circumstantial evidence of retaliation is exceptionally weak.  Plaintiff's fitness exams occurred six to seven months after his June 2011 speech and prior to his speech in the summer of 2012, and there is no other evidence to suggest a causal relationship.  As to Plaintiff's request for accommodations, the HR Director fulfilled her job duties by responding to Plaintiff's claim of disability and multiple requests for accommodation, but she could not assign Plaintiff any position until Dr. Garcia-Granda approved of his return to work.  After Dr. Garcia-

22

Granda gave his approval, the City offered Plaintiff the only available position that was consistent with Plaintiff's restrictions. Per Dr. Garcia-Granda, Plaintiff could not perform the functions of a lieutenant, and he rejected the City's offer of a clerical position. We agree with the district court that no reasonable jury could find that Plaintiff's speech played a substantial role in the allegedly retaliatory actions based on the evidence in the record.

Any remaining questions are resolved by the fourth stage of the analysis, because it is clear from the record that the City would have taken the same actions against Plaintiff regardless of his speech. The HR Director ordered the first fitness exam because Plaintiff had red eyes, appeared extremely tired, and said he was suffering from a sleep disorder and panic attacks that required professional and pharmaceutical treatment. A doctor confirmed that the exam was warranted. The HR Director ordered the second exam because Plaintiff appeared tired and described increasingly frequent panic attacks, one of which was so severe he had to remain parked in his vehicle for 45 minutes, and a sleep disorder that prevented him from working his assigned afternoon shift.[12] A doctor again confirmed that

---

[12] The HR Director instructed a junior employee to attend and keep notes of the February 2012 meeting. The notes state that during the meeting, Plaintiff explained that: (1) he was addicted to Ambien, (2) he was having three to five panic attacks a week, (3) he had experienced a panic attack that caused him to park his patrol car, wait 30 to 45 minutes in the car, and drive to a fire

23

the second exam was warranted, and the results of the exam corroborated the HR Director's concern that Plaintiff was not fit for duty without significant restrictions. As to his termination, Plaintiff could not perform the essential functions of a lieutenant and the City offered him the only available position consistent with his restrictions. Plaintiff rejected that offer by twice refusing to timely accept it. Thus, the inescapable conclusion from the record is that the City would have treated Plaintiff the same regardless of his speech.

## CONCLUSION

For the reasons discussed above, we **AFFIRM** the district court's order granting summary judgment to the City on Plaintiff's disability discrimination and First Amendment claims.

---

station to check his blood pressure, and (4) he had recently missed work when he had a panic attack that prevented him from leaving his house.